In the Matter of the Judicial Settlement of the Intermediate Account of the Acts and Proceedings of TITLE GUARANTEE AND TRUST COMPANY, as Trustee of the Trusts for the Benefit of LAURA BALFE WHITNEY and Remaindermen and HELEN BALFE DEMOTT and Remaindermen under the Last Will and Testament of THOMAS F. BALFE, Deceased.*

LAURA BALFE WHITNEY and Others, Appellants; TITLE GUARANTEE AND TRUST COMPANY, as Trustee under the Last Will and Testament of THOMAS F. BALFE, Deceased, Respondent.

In the Matter of the Judicial Settlement of the Intermediate Account of the Acts and Proceedings of TITLE GUARANTEE AND TRUST COMPANY, as Substituted Trustee of the Trusts for the Benefit of LAURA BALFE WHITNEY and Remaindermen and HELEN BALFE DEMOTT and Remaindermen under the Last Will and Testament of MARY A. BALFE, Deceased.

LAURA BALFE WHITNEY and Others, Appellants; TITLE GUARANTEE AND TRUST COMPANY, as Substituted Trustee under the Last Will and Testament of MARY A. BALFE, Deceased, Respondent.

Second Department, May 24, 1935.

* Modfg. and affg. 152 Misc. 739.

*Charles H. Kelby* [*Clinton J. Ruch* and *Charles M. McCarty* with him on the brief], for the appellants Laura Balfe Whitney and others.

*Charles W. U. Sneed,* special guardian for infant remaindermen, appellants.

*Timothy N. Pfeiffer* [*Russell Wiggins, Joseph V. McKee* and *Mizell Wilson* with him on the brief], for the respondent Title Guarantee and Trust Company.

CARSWELL, J.   It is sought to surcharge the trustee of these two estates in excess of a million dollars.   The detail is indicated to some extent in the minority opinion.   We favor a modification of the decrees declining so to do, by eliminating the allowances to the respondent for counsel fees, amounting to $25,000, and, as so modified, an affirmance of the decrees in so far as appealed from, without costs.

Our views for affirmance stem from the genesis of the relationship in life of the decedents with the corporate trustee and its corporate affiliates, likewise given in some detail in the minority opinion. We state, somewhat summarily, our reasons for so concluding.

(1) In our opinion the successor trustee under both wills succeeded to all the discretionary powers given by the two decedents to the original trustee.

(2) Under the will of Thomas F. Balfe the trustee was authorized to act in respect of the securities in the estate without regard to whether or not the trustee had a personal interest in these same kinds of securities or the companies to which they related. The decedent, through a provision in the will, in effect deprived his estate of the benefit of the doctrines in the cases that forbid a trustee acting under circumstances that involve what is called " divided loyalty." The decedent was willing that the trustee should act under conditions of divided loyalty. He had the power and right to so provide. That which he knowingly did with his own property did not impinge public policy or involve the doing of anything *malum in se* or *malum prohibitum*. The only safeguard left to the estate was that the trustee act honestly and in good faith. Decedent had confidence it would so act. The question, therefore, is whether there is evidence of bad faith.

There can be no bad faith predicated on the want of diversification or the undue concentration of the assets of the estate in particular securities. The decedent himself turned over the securities in the non-diversified form. He exempted the trustee from the statutes on legal investments. Decedent's relations with the corporate trustee and acts respecting the estate furnish a background which indicates that the decedent cast the lot of his estate with the lot of these two companies with which he had such an intimate connection during his life. He had stuck by the company and retained his holdings during the only periods comparable to the present one, to wit, the prior and less severe panic of 1907 as well as the post-war period of depression. It may be said fairly that the trustee has done exactly that which the decedent would have done if he had been alive during this same period during which the trustee acted.

The trustee declared dividends when a wiser policy, viewing the matter in retrospect, would have been not to declare them, but it must be said that, in so far as the trustee acted to save the companies, in making these dividends, it was likewise acting in the interest of the estate and its beneficiaries. Whatever helped the companies helped the estate and its beneficiaries, since their respective fortunes were intertwined almost inextricably. If that which was done to

help the companies did not help them, then of course it did not help the estate or its beneficiaries; but such acts as were done, whether wisely or unwisely, such as declaring dividends in certain years or buying stock of the companies to sustain market values, were done in good faith, even though they were futile acts, as subsequent events indicate.

This all resolves itself into the proposition that the testator, as he had a right to do, deprived himself and his estate of the benefits of the rules of law found in the statutes and in the cases, which rules were designed to protect such estate funds. The only rule of law of the benefit of which he did not deprive his estate was that which requires a trustee to act honestly and in good faith. We find no dishonesty. In view of the background of this estate, we do not find that there was bad faith. The fault, therefore, for the misfortune that has befallen this estate must be visited upon the testator himself (through the objects of his bounty) as a consequence of his placing this estate in the hands of the trustee bereft of all the safeguards provided by law for such funds, with the exception of the rule exacting good faith on the part of the trustee and the refraining from misfeasance.

(3) The same is true with respect to the estate of Mary A. Balfe. Her will seems not to have as broad a provision depriving the estate of the benefit of the rules of law forbidding a trustee to act under circumstances that may involve divided loyalty, such as is contained in the will of Thomas F. Balfe. But she, too, authorized the trustee to act without regard to " the general rules of law or any statute applicable thereto." This would include authorizing the trustee to act where there would otherwise be a violation of the rule prohibiting " divided loyalty." She likewise deprived her estate of any protection consequent upon the acts of the trustee, other than those involving a want of exercise by the trustee of " good faith " or want of common honesty. These provisions likewise authorized the trustee to refrain, if acting in good faith, from complying with the rules, in respect of trust funds, requiring a reasonable degree of diversification.

Respecting the mortgage certificates, there is no showing that these were purchased under circumstances involving bad faith or want of ordinary prudence. The purchase of mortgages from itself, otherwise illegal, became lawful perforce the provisions in the will, making inapplicable the case law and statutory safeguards, because they were bought in good faith.

Accordingly, we see no basis for surcharging the trustee under either will.

The decrees should be modified by eliminating the allowances to the respondent for counsel fees, amounting to $25,000, and as so modified affirmed, in so far as appealed from, without costs.

SCUDDER and JOHNSTON, JJ., concur; LAZANSKY, P. J., and YOUNG, J., dissent with the following memorandum: The stock of the trustee corporation and its affiliate had been held by the creators of the trust for many years. They must have had confidence in the trustee and its officers, evidenced by the unusually liberal powers given to the trustee. Thomas F. Balfe was a director of one of the companies. The trustee had reason to have confidence in the strength of the companies, based upon their survival of previous economic upheavals and their steady growth from year to year, with annual profits increasing and reaching up to the millions. The economic shock of 1929 did not affect the business of the companies. It was not until 1931 that the continued business depression commenced to make inroads upon the affairs of the trustee and its affiliate. It may well have been thought by its officers that a similar storm, though far more ruinous, would finally be weathered and normalcy restored. The record contains no proof of bad faith in failing to dispose of the trust stocks in 1931, 1932 and 1933, during which period the stock of the trustee corporation dropped from $142 to about $8 and its affiliate from $96 to about $2. Under these circumstances it should be held that the trustee was not guilty of negligence in failing to dispose of the stocks during the periods mentioned. Ordinary judgment exercised after the event may now readily determine that the trustee was guilty of an egregious blunder, but it should only be judged by reasonable foresight, and not by facile afterthought. In the light of events, it is easy enough to say today what should have been done yesterday. The record fails to disclose that the trustee under all the circumstances of the situation failed in its duty in this respect.

If there were nothing more than this, and some other minor considerations which we believe do not affect the situation, we are of opinion that the determination of the surrogate should be affirmed, although it brings a very heavy loss to the trust estates — not an uncommon situation in these days.

But there are certain transactions of the trustee which present a very serious question. In considering this question, we treat the two corporations, the trustee corporation and the bond and mortgage company, as one. The latter was organized by the former to serve as a guarantor of mortgages which the trustee corporation would place and sell to the investing public. In public advertising,

the two corporations pooled their joint capital and surplus. They had offices in the same building; had the same president and chairman of the board of directors, the same executive vice-president; the vice-president of one was the treasurer of the other. The trustee corporation kept the books of the bond and mortgage company, and had intimate knowledge of its affairs. They were like two peas in a pod.

While the market price of the stock of these two corporations was rapidly falling and there were plain signs that their business was decreasing, the trustee bought stock of its affiliate and the affiliate bought stock of the trustee company, and no stock of the trusts was sold except a small quantity at very low prices in May, 1933. There is involved the subject of " undivided loyalty " — the failure of the trustee to live up to the high standards required by law. There is no question of bad faith in fact involved. It is entirely one of breach of duty as a matter of law.

There may be a difference in the two estates as to the duty in this respect. We hold that, under the Mary A. Balfe will, the powers of this trustee as successor trustee are the same as those given under the will of its predecessor, the husband of the deceased.

Under the will of Thomas F. Balfe, the trustee had full power (1) to manage, control, invest and dispose of the property of the estate in any manner it saw fit for the best interests of the estate and the beneficiaries; (2) to retain, without liability for loss or depreciation in value, any investments belonging to deceased at the time of his death; (3) to sell any of the securities belonging to the estate; (4) in all respects to deal with the estate as fully and completely as the testator could do; (5) using the words of the will, " I furthermore authorize and direct that my said Executor and Trustee may freely act under all or any of the powers by this will given in all matters concerning my estate and the trusts herein created without the necessity of obtaining the consent or permission of any person interested therein or the consent or approval of any Court, notwithstanding that such Executor and Trustee may also be acting or interested either individually or as trustee of other trusts or as agent for other persons or corporations interested in the same matters."

Excluding item (5), the powers are very extensive, yet they do not suggest the right in the trustee to ignore the trust funds to the advantage of the trustee. Nor should it be held that the provision above numbered (5) permitted the trustee to act for its own benefit to the harm of the estate. In case of a trust relationship, the language must be limited to its narrowest compass. It should not be so construed as to create a situation which is abhorrent to the law, as

stated in *Wendt* v. *Fischer* (243 N. Y. 439). If it may be read so as to deny a power in the trustee to give consideration first to its own interest rather than, if at all, to the trust estate, with the possibility that the trust estate might be destroyed, then that should be the reading. All that the creator of this trust meant was that the trustee would have the right to be interested, on its own account, in the same properties as those held in the trust; it might sell its own property to the trust estate and might buy property from it. But it never could have been intended by the deceased that in such matters and the like it should act to the loss and damage of the estate. It is incredible that the creator of a trust would be willing to give to a corporate trustee the power so to act for its own benefit as possibly to bring financial disaster to those of his blood whom he sought to make the object of his bounty. It would require clear and express terms showing an intent to make such a reckless gift of power, before a court, which watches jealously over the acts of a trustee, would hold that such a power had been granted. Item (5) does not deliver any such power into the hands of the trustee.

The powers of the trustee under the Mary A. Balfe will, transferred by the death of the original trustee to the successor trustee, were: (1) To continue to hold as investments securities belonging to the testatrix at the time of her death, whether those known as " legals " or " non-legals;" (2) to sell, dispose of or change any such investments, and to invest and reinvest in " legals " or " non-legals;" (3) to invest or reinvest, as testatrix might have done if living; (4) exempting trustee from liability for loss in investment or reinvestment retained in good faith.

There is nothing in this grant of power which conveys the idea that " divided loyalty " is authorized.

We are of opinion that the trustee failed in its trust duty as a matter of law, based upon the following facts:

On July 1, 1931, the trustee held for the two estates 5,500 shares of bond and mortgage company stock valued at " over the counter " prices at $467,500, and 5,555 shares of its own stock, at " over the counter " prices, at $693,930, or a total of $1,161,430. The prices at that time were $85 and $126 a share, respectively. The trustee at the same time held over 17,000 shares of bond and mortgage company stock, and over 25,000 shares of its own stock in other trusts. The trustee owned over 15,000 shares of its affiliate, and its affiliate owned over 10,000 shares of the trustee corporation. Beginning about that time the business of both companies began to decrease, and losses commenced to increase. The market prices of the stock of the two companies began to fall. With some slight reaction, there was a gradual drop from $126 a share of the trustee's

stock, and $85 a share of the bond and mortgage company's stock, in 1931, to about $8 and $2, respectively, in 1933.

In March of 1931 the bond and mortgage company had bought shares of the trustee company at $140 per share, the highest price from then up to the present time.

From May 22, 1931, up to April 8, 1932, the bond and mortgage company bought 1,700 shares of the trustee company stock at prices ranging from $121.50 down to $39.75 in April, 1932.

In May of 1931 the trustee company bought bond and mortgage company shares at $86, which was the highest from that time to date.

It thereafter bought, from June 9, 1931, to December 17, 1931, 850 shares of bond and mortgage company stock at prices varying from $80.50 to $48.50.

Prior to the dates mentioned, these companies had bought the stock of each other. Whether or not it was proper for them so to do, is no concern of the present situation.

Undoubtedly, the stocks bought in 1931 were bought to sustain a falling market, and, as one of the prominent witnesses for the trustee testified, to make profits. The real significance of the situation is that the trustee was buying for its own benefit during a falling market and, therefore, could give no consideration to the advisability of selling the stocks of the trust estates. It may be that the trustee thought to buy would be for the benefit of the company and to its many stockholders; and it may be that such action would indirectly help the trust estates, but that indirect benefit would come, not because the trustee gave heed to its duty to the trust estates, but rather to its own interest. When a trustee decides to and does buy its own stock for itself, it deprives itself of the capacity of passing judgment on the advisability of selling stocks held for the trust. As the market was rapidly falling, it was the duty of this trustee to decide whether to sell or not to sell the trust stocks. It could make no independent decision with reference thereto when it decided to buy for itself to hold up market prices and make profits for itself. If it had sold the stocks in these trust estates, even if such sales were gradually made, the inevitable result would be to decrease the market prices of the stock of the companies and in all likelihood impair their business, which in the larger measure depended upon public confidence. Furthermore, if it was decided to sell the stocks in these trusts, it would necessarily follow that it would have to be decided to sell similar stock held in other trusts. Therefore, even if the trustee, despite the fact that it had bought these stocks, had the capacity to consider the advisability of selling the trust stocks, its decision would necessarily have to be in favor of not selling in order to save these two

companies. In our opinion, the purchase of these stocks was a breach of trust duty as a matter of law. As stated, we do not charge the trustee with bad faith as a matter of fact. Its officers may have thought they were directing it along the right path, but they advised it along lines which the law will not tolerate. The loss is a very heavy one, and it must fall on the one legally responsible therefor. That the trustee may not be chargeable with negligence because it refrained from selling the trust stock under consideration, does not affect the question of its failure to adhere to the inexorable rule of " undivided loyalty " to the trust estate.

For all the stock of the two companies held in trust, the trustee should be surcharged from the time when it deprived itself of free and unhampered action. The facts indicate that July 1, 1931, is the time when, under the circumstances, it might, in the exercise of unbiased and reasonable judgment, have started in to sell the stock of the trust estates. Of course, it would not have been wise to thrust this stock upon the market at one time. One year, however, would be ample time to dispose of it. The surcharge should be the difference between the market prices of the stock as averaged between July 1, 1931, and July 1, 1932, and the aggregate of the value of this stock unsold at the time of the accounting and the amount received for the stock sold in 1933.

As to the $26,000 of mortgages bought from itself, there should be no surcharge for those bought in the Thomas F. Balfe estate. Such purchases might well come within the purview of item (5), above considered. But as to those bought for the Mary A. Balfe estate, the trustee should be surcharged with the same, the mortgages to be transferred by the trustee to its corporate self upon payment of the principal and any profit made by the trustee to the trust estate, or, at the option of the beneficiaries, the mortgages may remain in the estate and the profits of the trustee thereon be made a surcharge. We hold that these mortgages do not come within the provisions of subdivision 7 of section 188 of the Banking Law. We are also of the opinion that under the circumstances of this case the surrogate's allowance of $25,000 for legal fees was improvidently made.

Decrees of the Surrogate's Court of Orange county modified by eliminating the allowances to the respondent for counsel fees, amounting to $25,000, and as so modified affirmed, in so far as appealed from, without costs.