Hugh Y. N. Bodine, S.
Charles M. Dow died December 10, 1920, leaving a will dated October 17, 1918, and a codicil thereto dated December 9,1920, the day preceding his decease. He left two children, Howard M. Dow, who died in 1926 leaving his widow Mary C. Dow and three children, Charles, Helen and Mary, and a daughter, Alberta Dow G-oodwill, who died in 1952 leaving two children, Eleanor and Charlotte.
Mr. Dow was a lifetime banker and a successful one. He founded the Jamestown National Bank in 1882, which later became a part of the National Chautauqua County Bank. He continued as president of the Jamestown National and successor bank down to his death in 1920, a span of 38 years. At his death he owned 1,510 shares, out of a total of 5,000 shares. The value of these shares as appraised was $226,500, the balance of the estate being some $224,000. This balance was willed to his wife and two children and by codicil to the children only, Mrs. Dow having predeceased him. Its disposition is unimportant save as reflecting on the general testamentary plan.
The issues here concern the disposition of the 1,510 shares of bank stock and the administration thereof through the testamentary trust set up in clauses Second and Tenth, as follows:
“ Second — I give and bequeath unto my trustees hereinafter named all my stock in the National Chautauqua County Bank, in trust, however, for the uses and purposes hereinafter prescribed, with full power and authority to hold the same as an investment for the purposes of this trust, or to dispose of the same, and to reinvest in proper securities, whenever all of such trustees shall concur in such action, it being my desire that the bank stock be retained in a common fund so long as this is found practicable.” * * *
“ Tenth — My executors are hereby authorized and empowered to sell and convey my real estate, subject to the life use of my wife, provided in the third numbered paragraph of this instrument, on such terms as they may deem proper. The executors may do any and all acts necessary and proper in the administration of my estate by a majority of their number, and the acts of such majority shall be valid for all purposes, but tohen acting as trustees of the trust fund herein created, they must act by unanimous consent and agreement, evidenced in writing, to authorize a sale of all or any part of my stock in the National Chautauqua County Bank, as well as upon the reinvestment of the proceeds and avails thereof.” (Emphasis mine.)
*417 There is sharp division of opinion as to just what testator intended by his choice of this language. Unquestionably testator, with good reason, had a family pride in his bank. It was his creation. His had been the guiding hand throughout the years and it had become a financial landmark in the community served by it and as the bank grew and prospered so also did the Dow name become a symbol of power and influence socially and financially, the bounds of which were far from being confined to the Western New York area. In fact, the National Chautauqua County Bank is referred to in the 1921 History of Chautauqua County as the ‘ ‘ mother ’5 of all Chautauqua banks. In recognition of his outstanding abilities and service it may be noted that two universities conferred upon Mr. Dow the honorary degree of Doctor of Laws.
It is obvious that a construction of the trust provisions must take into account these side lights into the character and nature of what may be assumed to be the thought which motivated the will. We may also take into account the fact that as the dominant figure in the bank, testator knew well the ability and character .of his officers, or lieutenants, and his board of directors, for had he not implicit confidence in them to carry on his policies it is not probable that he would have made the disposition he did. That he had every confidence in his son-in-law, Mr. G-oodwill, is abundantly evidenced in his expressed desire to have him succeed him as president.
The conclusion is clearly justified that pride in his banking success and the natural desire to preserve and foster the family name in connection therewith, motivated his trust plan. For no other discernible reason would he have declared his “ desire that the bank stock be retained in a common fund so long as this is found practicable ” and placed the strictures on its being broken up by providing that the three trustees “must act by unanimous consent and agreement, evidenced in writing ” to authorize it. What he intended by the term * ‘ practicable ’ ’ may, as I view it, be readily surmised. One contingency it seems he would not have deemed ‘‘ practicable ’ ’ would be to have the stock sold in appreciable quantities in a period of recession or depression when to do so would inevitably raise a danger signal, a manifestation of lack of faith in the institution which might well lead to disastrous results to stockholders and .the bank. We can well believe that such would have been the last thing he would have considered doing in such a crisis were he alive. Testator was surely cognizant of the limited market for bank stock in Jamestown. He undoubtedly recognized the distinction out of experience between sales en bloc by an outsider and those of bank officials or, to the same effect, stock which they controlled.
*418 The wording lends strength to this interpretation. He expressly stated his desire that the stock be retained in a common fund as long as found practicable. To say that this to him meant to sell any or all as soon as practicable from a mere sales standpoint is plainly a distortion for it would set at naught his expressed desire to retain the stock in a common fund — it could not be sold and kept together at the same time. Personally he had accumulated this stock over a long period. It had served him and his family well. He was content to have more than half of his large estate invested in it.
His will testifies to his faith that the bank would continue to grow and the value of the stock with it. He knew, we may assume, that his power over the ultimate disposition must end on the death of his two children. Just short of a direct prohibition to sell it, or, just short of a direct command to retain it, he provided as he did. Apparently the fear of lack of diversification in the trust assets or of “ too many eggs in one basket ” was not his. Rather, his apparent fear was speedy disintegration of his interest in the financial monument he had erected over the years and in which he had justifiable pride and faith.
On the other hand he was not blind to the fact that factors such as merger or reorganization, for example, might enter the financial picture; factors that might make it appear to the best interests of all concerned to dispose of the stock — a sitiuation that would make it practicable to sell rather than to retain.
The fact that the trustees did in 1925 sell 200 shares and thus indicate their opinion that piecemeal sales would not contravene the desire of testator is beside the point so far as bearing on what I deem the plain purport of the will. True, they could have sold it all so far as they were concerned but if this had turned out to have been bad business judgment in light of later developments, how about the rights of the remaindermen to complain, and complain they doubtless would especially had the trustees been third parties.
Regardless, however, of the reliability and potency of these surmises the fact remains that the trustees were not only authorized to hold the stock as an investment but it was the expressed desire that they do so so long as found practicable which expression was converted into a virtual command by the provision that all three had to concur in writing to authorize a sale of any part of it. This power and the discretion accompanying it within the limitations imposed, as I have found, was vested in the parents of testator’s grandchildren who would eventually profit or lose by the exercise of that discretion and whose *419 eventual welfare was surely as close to them as to their grandfather. And lest it be lost sight of, this stock was testator’s to dispose of as he chose. If, in effect, he desired to deprive his trust estate of the benefits of the doctrines in the cases that forbid trustees acting under circumstances that involve what is called “divided loyalty ”, he had the perfect right to do so. (Matter of Balfe, 245 App. Div. 22.) In truth the circumstances of that case are so essentially similar by fact and analogy to those at bar that the legal principles there enunciated can well be applied here. It disposes of the question of 1‘ divided loyalty ’ ’. Here, as testator must have realized, he was placing the Goodwills and his son Howard in the position of treading between three loyalties: to the trust for their respective children ; to the bank as the guiders of its destiny; to themselves as beneficiaries of income. Such a course “ did not impinge public policy or involve the doing of anything malum in se or malum prohibitum. The only safeguard left to the estate was that the trustee[s] act honestly and in good faith. Decedent had confidence it [they] would so act. The question, therefore, is whether there is evidence of bad faith.” (Matter of Balfe, supra, p. 24; emphasis mine.)
No final accounting was filed by the trustees until after the death of Alberta D. Goodwill on September 30, 1952, a life beneficiary and trustee whose death terminated the trust. At that time all that remained in the trust estate was $59,327.60 and some common stock, the proceeds of a sale of 200 shares of bank stock in 1925 while Howard Dow was living. He was succeeded as provided in the will as trustee by his widow, Mary Campbell Dow, mother of the objectors to the account. Objectors Dow seek to surcharge the surviving trustee, Fletcher Goodwill, and the estate of his cotrustee, Alberta D. Goodwill, in at least the original inventory value of 1,310 original shares (later split 4 for 1 or 5,240), $196,500, which were surrendered for no remuneration except absolution from assessment, in March of 1933 following the bank holiday and reorganization. Claim for surcharg’e is also made for $1,283.66 due to erroneous distribution of principal in August or September, 1926.
Specific objections filed resolve the issue to be primarily the question of whether the Goodwills as trustees were negligent, acted in bad faith, committed a breach of fiduciary duty, or put self-interest above that of beneficiaries, in failing to dispose of the National Chautauqua County Bank stock in the trust and to reinvest the proceeds prior to the failure of the bank in March, 1933.
*420 The surrender of the hank stock was authorized by the Surrogate in 1933 in a proceeding brought for that purpose by Mary G. Dow at the instance, she alleges, of the trustees Goodwill and the attorney for the depositors’ committee of the bank. Her attorneys drew the petition which set out the salient facts regarding the creation and existence of the trust, that the stock had been held and administered in accordance with the provisions of the will; that if not surrendered an assessment might ensue and wipe out the remaining assets of the trust. In her prayer for relief she requested the court to instruct the trustees as to the course to be followed by them in connection therewith and requested authorization to permit the trustees to surrender the stock in order to avoid a possible assessment. All of the parties were in court arid a special guardian was appointed for the infant grandchildren, remaindermen under the trust.
Fletcher Goodwill and Mrs. Goodwill’s executors, herein referred to at times as the Trustees Goodwill, assert that the decree entered in that proceeding is res judicata of the issue here involved, in that the special guardian in his report which the court followed, gave it as his opinion that the trustees had not been guilty of any violation of law in retaining the bank stock owing to the provisions of the trust and concluded that the interest of the infants would be protected and furthered by the execution of the proper agreements and surrender of the stock. He recommended the petition be granted. The Surrogate’s decree confirmed and approved the various acts and proceedings of the trustees relative to the stock and further decreed “ that each and all of such persons, individually and as such trustees, be hereby released from any and all liability in connection with the surrender of such common capital stock ”.
Objectors’ answer is that the special guardian and Surrogate both went out and beyond the purpose and scope of the petition and proceeding in so reporting and decreeing as to the legality of the stock holding and in confirming the acts of the trustees and in releasing them of all further liability. All that was contemplated, they contend, was instruction and direction relative to surrendering the stock in order to escape assessment liability. From the record and attendant facts I conclude that this decree cannot be held to be res judicata of the issues presented by the objections. That proceeding was directed to one sole objective, the authorization to surrender the trust stock to facilitate reorganization of the bank and particularly to avoid an assessment of staggering proportions. While the decree did confirm the acts of the trustees in retaining the stock it did not contemplate or intend to comprehend and decide, in my opinion, the inci *421 dental questions of administration of the stock as an asset of the estate. That the trustees had the abstract legal right to hold the stock as an asset was not open to serious question. Whether they in administering the trust should have continued to hold it or were justified in so doing was an entirely different question and one not contemplated by the petition or decree.
The fact remains, however, that that proceeding must be considered an important element in connection with the further claim of respondents that the objectors are barred by laches and the Statute of Limitations. The proceeding marked the end of the trust for all practical purposes. In view of Mrs. Bow’s activity in urging, from at least 1928 on, the sale of the stock, her consulting with various eminent attorneys and investment counsel coupled with the closing of the bank in March of 1933, and its failure to reopen with any implications of bad management deducible therefrom, it seems strange if not incomprehensible that so much time would be allowed to elapse before any affirmative action was taken. In 1933 was the time, it would seem, .she was put on inquiry and yet in her petition at that time she alleged that the stock had been held and administered in accordance with the provisions of the will.
The circumstances bring the situation within the rule that the Statute of Limitations is applicable where the trust has been violated to the knowledge of the beneficiary or could have been learned of by the use of reasonable diligence. In Bogert, Trusts (vol. 4, p. 2, pp. 202-204) the rule is stated as follows: “ The true rule with respect to the statute of limitations and express trusts is more clearly stated as follows: During performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the cestui, but, if the trustee violates the trust and cestui knows of such conduct, or could have learned of it by the use of reasonable diligence, the court will apply the statute of limitations which governs equitable causes of action (Italics supplied.)
There has been given no reasonable explanation for this delay of nearly 20 years on the part of objectors and their guardian. The trust property was lost in 1933 by its surrender. If bad faith or misfeasance on the part of respondents was deemed responsible then was the appropriate time to have ferreted it out. While the lack of diligence of a guardian in a given case may not be chargeable to his ward yet the attitude of Mrs. Dow in this respect does have a bearing here it would seem. She, too, occupied a dual position as a trustee and as guardian. The two were intertwined and yet on the turn of events resolved emphat *422 ically on her fiduciary duties to the children. The fact that she did nothing — that the children did nothing during and beyond the statutory period of limitations until something occurred to light the fuse renders their position untenable measured both by legal and equitable standards. (Matter of Bunker, 183 Misc. 523.) The existence of the trust relation and the continuance thereof until the death of the last life tenant does not serve to alter the situation as I view it. This entire proceeding is based primarily on the bank stock holding. It is the crux of the claim that respondents hold fast to the stock for personal and selfish reasons in violation of their duty to the remaindermen. The wiping out of the stock in 1933 gave rise to the claim irrespective of the trust relation. The long delay in asserting the claim after the beneficiaries could have, with the exercise of reasonable diligence, ascertained the facts they now rely on, makes them chargeable with laches, an equitable bar. Prosecution of stale claims is not favored and the long continued apparent acquiescence of these objectors and of their fiduciary representative before them in the acts of the two trustees until the death of one and superannuation of the other impresses one as unfair • and prejudicial and as not affording ground for equitable relief. (Matter of McElrath, 238 Iowa 1239; Hifler v. Calmac Oil & Gas Corp., 10 N. Y. S. 2d 531, affd. 258 App. Div. 78; Matter of Arnold, 165 Misc. 455.)
While not necessary to give further consideration to the merits of the case in its larger aspects in view of the foregoing, nevertheless in justice to the parties I will record briefly my conclusions thereon.
As before indicated testator reposed in his trustees, as he had a perfect right to do and for reasons we have attempted to glean from undisputed facts and circumstances, the administration of a trust which reposed loyalties and responsibilities in several ways although at the same time inextricably interwoven. The trust plan left only the safeguard “ that the trustees act honestly and in good faith” (Matter of Balfe, 245 App. Div. 22, 24, supra) and that leaves as the only question to be considered, whether there is evidence of bad faith.
As in all cases of this nature the one at issue must be decided almost wholly on the particular facts present. Precedents are valuable and controlling as to general legal propositions but as there are but very seldom, .if ever, cases with the same general facts and background each in the final analysis stands on its own ground in application of law to facts.
The bad faith with which we are concerned, as I have construed the will, must be confined to the failure to sell the stock *423 when it became evident that its value was slipping as a result of the economic collapse and during brief periods of encouragement and consequent recovery in a measure. It necessarily follows that that was just the time it would be most improvident to attempt to move any considerable amount of the stock. It would amount to about the same in its effect on the public as rumor or knowledge that the officers were moving their personal deposits to another bank. It would impair public confidence when it was most needed. That Mr. Goodwill appreciated this is demonstrated by his purchase, unwittingly though it was, of Mrs. Dow’s personal stock in 1930. That there was an available market of recognizable proportions after 1929 has not been nor could it well be established, in my opinion.
The argument of improvident management of the bank and the selfish interest of Mr. Goodwill with relation thereto as indicating dishonesty and bad faith falls by its own weight in light of the facts. Granted, that dividends should have been cut, is this evidence of dishonesty in the sense used here? I think not for here again we have the public reaction to consider. The failure or rather inability to carry out the advice of the Banking Department is not evidence of dishonesty. Frozen or slow assets cannot be reactivated overnight and that is what this bank with a host of others was confronted with. Nor am I impressed with the negotiations, such as they were, having to do with Marine Midland. Viewed as of now it was a great error in judgment not to have grasped any opportunity, however drastic the terms that might be imposed and sold out. As of now it would have been the practicable thing to do. As of then if the majority of the trustees, acting honestly and in good faith, did not so deem it, no breach of trust was involved.
The pros and cons of the argument in all its phases are most ably presented by counsel in their numerous briefs and are far too extensive to be here set out. They present from the voluminous record a question of fact which must be decided as such. So far as I can discern there was no dishonesty or bad faith, and that is the principle on which decision depends.
The remaining question concerns the erroneous distribution as income of proceeds of sale of certain stock rights amounting to $1,283.66. The account, Schedule F, gives the date of distribution as September 9, 1926. The one half distributed to the committee for Howard Dow was received by the committee as stated in his account, on August 9, 1926. The rights are stated to have been sold August 9, 1926. The distribution date may thus be held to have been August 9, 1926. Mrs. Dow was appointed successor trustee by an order granted September 7, *424 1926. It would thus appear she was not responsible for the error thereby leaving the resultant liability to be borne by the other trustees and they are accordingly surcharged with interest thereon.
A decree may therefore be applied for dismissing the objections except as indicated and surcharging the estate of Alberta Goodwill and Fletcher Goodwill in the amount of $1,283.66, with interest from August 9, 1926.