In the Matter of the Accounting of HOWARD KELLOGG, as Surviving Trustee under Trust Agreement with SPENCER KELLOGG, SR.

Supreme Court, Erie County, July 11, 1962.

542

*Phillips, Mahoney, Lytle, Yorkey & Letchworth* (*Robert M. Hitchcock, William E. Lytle* and *William A. Bain* of counsel), for petitioners. *Jaeckle, Fleischmann, Kelly, Swart & Augspurger* (*Manly Fleischmann, Adelbert Fleischmann* and *John G. Putnam Jr.,* of counsel), for respondents. *Mark N. Turner,* as special guardian.

REID S. MOULE, J. By an agreement dated June 26, 1922, Spencer Kellogg, Sr., the father of Howard Kellogg, created a trust, hereinafter referred to as the Lochevan Trust, and transferred to it 9,993 shares of 10,000 shares outstanding, of the capital stock of Lochevan Company, Inc., the assets of which consisted of 8,000 shares of the common stock of Spencer Kellogg & Sons, Inc., and a family estate, known as Lochevan and situated on the shores of Lake Erie at Derby, New York.

In 1938, under the impact of the personal holding company tax, the Lochevan Company, Inc., was dissolved and its assets distributed to the trust which apparently had by then received the other seven of its outstanding shares and was thus its sole stockholder. On July 28, 1961, Spencer Kellogg & Sons, Inc., was merged with Textron, Inc.

The original trustees named by the trust instrument were Howard Kellogg and Elizabeth K. Mann. The agreement provided that in the event of the death of a trustee the oldest of the settlor's children then living should take the place of the

deceased trustee, this order to be maintained until the termination of the trust.

In 1947, Elizabeth K. Mann died. She was succeeded as cotrustee by her sister, Ruth K. Terry. Shortly afterwards, Howard Kellogg as surviving trustee and Ruth K. Terry as successor trustee filed an account for a period ending December 31, 1947. The account was approved by this court on July 30, 1948.

On March 21, 1960, Ruth K. Terry died and on April 12, 1960, Doris K. Neale, the next child of the settlor in line, consented to act as successor cotrustee.

On May 23, 1960, Howard Kellogg and Doris K. Neale commenced this proceeding for the judicial settlement of the account of the former for the period December 31, 1947 to April 12, 1960 and for a determination of the propriety of the proposed sale by the trust of the Lochevan property to Howard Kellogg individually.

Certain of the respondents named in the petition appeared and filed an answer. A special guardian was appointed for all infant beneficiaries of the trust and he also filed an answer to the petition. Although both answers contained objections to the proposed sale of the real property, these objections were withdrawn at the time of trial. We are, therefore, concerned only with the objections to the account of Howard Kellogg.

In this proceeding, personal jurisdiction was never acquired over the estate of Ruth Kellogg Terry. The objectors, asserting that the fault lies with Howard Kellogg only, seek no relief against her estate. We note that the "Sixth" paragraph of the trust instrument provides that the trustees are to be liable only for their own negligence. Even if her estate could be held liable in the present situation, however, such liability would be in addition to that of Howard Kellogg whose liability would be joint and several. Consequently, her estate is not a necessary party to this proceeding, and the objectors may seek relief against Howard Kellogg alone. (2 Scott, Trusts [2d ed., 1956], § 224.6; Bogert, Trusts and Trustees [2d. ed., 1962], § 862; Restatement, Trusts 2d [1959], §§ 224 [comment a], 268 [comment a]. See *Matter of Rosenfeld*, 180 Misc. 452 [1943]; *Meldon* v. *Devlin*, 31 App. Div. 146 [1898], affd. 167 N. Y. 573; *Matter of Durston*, 297 N. Y. 64 [1947].)

The objections to the account are directed to the retention of the stock of Spencer Kellogg & Sons, Inc., as the sole income-producing asset of the trust. This stock by reason of several stock splits and dividends, amounted by the time of the present accounting period to 120,000 shares. The market value of

these shares showed an overall decline for the accounting period, a period of considerable advance in the recognized stock averages.

Objectors contend that this stock was retained by Howard Kellogg in violation of his fiduciary duties as trustee, and that the trust has thereby suffered a loss of principal and income in excess of $5,000,000, for which amount they seek to surcharge him. Their objections are based on the charges that retention of the stock was motivated by the selfish interests of the trustee and of his son, Howard, Jr., both of whom held substantial stock interests in their own right and were highly paid officers of the company; that he failed to use to the advantage of the trust inside information available to him in his position as a large stockholder and officer of the company, from which information he knew or should have known that both the yield and the market value of the stock would decline; and that this stock did not, in any event, constitute a prudent investment for the trust.

The objectors, as appears from their reply brief and elsewhere, do not seriously contend that Howard Kellogg may be surcharged for the sole reason that he occupied during the accounting period a position of theoretically and potentially conflicting interests. The theoretically adverse interests would, of course, consist of the above-mentioned interests of himself and his son as stockholders and officers of the company. Because it is not entirely clear that the objectors do concede this point, however, we shall briefly consider the question. We think, for two reasons, that liability cannot be imposed upon this basis.

First, the trustee was placed in this position by the settlor of the trust. When the trust was created in 1922, Howard Kellogg was the vice-president and general manager of the company. He then owned 7,200 shares of the company's stock, which, adjusted for intervening stock splits and dividends, is equivalent to more shares than he held at any time during the accounting period. In view of the family situation at that time (of Howard Kellogg's two brothers, one had already left the business for other interests and the other was many years younger) it must have been obvious that Howard Kellogg was destined for leadership of the company.

Neither the assets of the trust nor those of the holding company were the result of mere chance (such as may be the case when the original assets of a trust are determined merely by reason of their having fallen into the residuary estate of a decedent). It is quite clear from the trust instrument itself, as well as from the background of its creation, that it was the settlor's intent to put into effect a well-defined scheme of his

own making. The holding company, which held the Spencer Kellogg & Sons, Inc., stock, was, until the creation of the trust, owned entirely, or almost entirely, by him. Retention of the stock of the holding company was expressly authorized, and even preferred, by the trust instrument. So far as any conflict of interests is concerned, it could make no difference whether the Spencer Kellogg & Sons, Inc., stock was held by the trust directly or through the holding company. We find that Howard Kellogg's position of conflicting interests, so long as the conflict remained merely passive in nature, was entirely consistent with the intent of the settlor.

This is sufficient to absolve the trustee of any liability based on a mere theoretical conflict of interests. (Cf. *Matter of Ridings,* 297 N. Y. 417 [1948]; *Matter of Balfe,* 245 App. Div. 22 [1935]; *Matter of Dow,* 32 Misc 2d 415 [1955], mod. on other grounds 3 A D 2d 968 [4th Dept., 1957]; *Matter of Pate,* 84 N. Y. S. 2d 853 [1948], affd. 276 App. Div. 1008; *Matter of Knollwood Real Estate Co.,* 17 Misc 2d 159 [1958].)

Nor is it sufficient ground to remove him as trustee, for as the court said in *Matter of Weiss* (33 Misc 2d 773, 776 [1962]), in referring to a possible conflict of interest, " that was a situation created by the testatrix' will and is not a basis for removal of the executor (*Matter of Foss,* 282 App. Div. 509; *Matter of Sherman,* 9 Misc 2d 731)."

The second basis of this holding is the decree of Justice GEORGE T. VANDERMEULEN, dated July 30, 1948, settling the account of the trustees for the period ending December 31, 1947, which expressly authorized retention of the Spencer Kellogg & Sons, Inc., stock.

At the time that the decree was rendered, Howard Kellogg's position of theoretically conflicting interests existed in substantially the same form as during the present accounting period. Section 1311 of the Civil Practice Act provides a statutory version of the doctrine of *res judicata* directed particularly to the problem of securing a binding adjudication where there are unborn and undetermined beneficiaries of a trust. We hold that the 1948 decree constitutes a conclusive adjudication precluding the imposition of liability upon Howard Kellogg upon the sole basis of his theoretical conflict of interests.

Because of the conclusions previously reached we do not consider it necessary to determine whether subdivision 6 of section 21 of the Personal Property Law authorizes retention even under conditions of divided loyalty or whether, rather, it concerns solely the question of trust investments not eligible under other subdivisions of that section. See *Matter of Durston*

(297 N. Y. 64, *supra*) which implies that this section might authorize retention of an investment even in the case of a conflict of interests.

Although Howard Kellogg may not be held liable upon the basis of a conflict of interests so long as such a conflict remained merely passive, he was not relieved of the responsibility to act in the best interests of the trust and not in pursuance of any selfish interests adverse to those of the trust.

The selfish interests alleged by the objectors as motivating the trustee's retention of the stock consisted of, first, a desire not to affect adversely the market price of his own holdings and, second, a desire to retain control of the company for the benefit of himself and his immediate family, particularly his son, Howard, Jr.

Although the objectors suggest that the sale of a large block of the trust stock would have depressed the market price of the stock, no proof was offered as to the extent of such depressant effect. We do not believe that any such effect could have had any long range consequence. Since neither the trustee nor his son made any substantial sales during the accounting period, it would not seem that in fact the trustee had any significant interest in avoiding a temporary depression in the market value of the stock. Indeed, if control were a dominant motive, a temporary depression in the price of the stock could well have been an aid to him. Considering both the nature of the situation and the evidence before us, we think it clear that the trustee was not acting in pursuance of any such supposed interest.

The other selfish motive alleged by objectors, retention within the family of control of the company, requires more consideration.

Howard Kellogg was chairman of the board until 1953, when he retired. His son, Howard, Jr., was president from 1946 until he became chairman of the board in 1959. Both were directors until the Textron merger, when Howard, Jr., became a director of Textron, Inc. Both, of course, were well compensated in such positions.

With the exception of the last annual meeting, which was held after this litigation had been commenced, the stock in the trust was always voted for management and for re-election of the trustee and his son as directors. There was never any contest in this respect, however.

Throughout the accounting period the percentage of the outstanding stock of Spencer Kellogg & Sons, Inc., held by the trust remained substantially constant at about 10%. (Slight

changes in the total number of shares outstanding caused insignificant variations in this percentage.)

The objectors put in evidence a compilation of the holdings throughout the accounting period of what was designated as the "Kellogg Group". The holdings of this group, which included the Lochevan Trust, declined from about 25% of the outstanding stock in 1947 to about 18.3% in 1960. This decline is largely accounted for by gifts by Howard Kellogg of a large part of his personal holdings and by the disposal of almost all of the Spencer Kellogg & Sons, Inc., stock held by two trusts, which had been created by Spencer Kellogg for the benefit of his daughters, Mrs. Neale and Mrs. Terry.

The usefulness of this compilation is, however, severely limited by reason of two closely related considerations. First, we do not know to what extent the "Group" is representative of all of the interests which might be expected to be favorable to continuation of Kellogg domination of the company. It does not, for example, include the holdings of Donald Kellogg and Andrew Clark, who apparently sold a substantial number of shares in the last few years of the accounting period. Nor does it include stock held by the trustee's children other than Howard, Jr., and by the trusts for the trustee's grandchildren other than those of which Howard, Jr., was a trustee, which stock was received by way of gifts from the trustee.

The second limitation on the usefulness of this compilation lies in the lack of proof as to the percentage of stock necessary for control of this company. Although we do not consider it of great significance, we note in passing that Kellogg control of the company was not impaired by the fact that the trust stock was not voted at the last meeting.

The assertion that the trustee, in retaining the Spencer-Kellogg & Sons, Inc., stock in the Lochevan Trust, was motivated by a desire to retain control of the company in himself and his son is based almost entirely on inference from the obvious benefits to them of such control and from the above-mentioned figures as to the percentage of stock held by the "Kellogg Group".

In support of this inference, two facts are advanced. The first is that during negotiations by the company for the purchase of the Beacon Milling Company, the Kellogg management considered requiring the Beacon group to place their stock in escrow. This, however, occurred after Howard Kellogg had resigned as chairman of the board and when he was no longer actively engaged in the management of the business; indeed, he first learned of it at the trial.

The second fact is similar in nature. After a meeting concerning a proposed merger, at which the trustee was present, Lehman Brothers, in a letter dated July 20, 1960, wrote, '' We certainly would be guided by your wishes about keeping the present management team intact.''

The achievement of this desire to keep the Kellogg management intact in the event of a merger would not in itself be detrimental to the interests of the trust, and we do not believe that retention of the trust stock was necessary to this end nor that such a desire influenced the trustee in retaining the stock.

Implicit in objectors' treatment of this entire question of motivation is the assumption of a complete identity of interest between Howard Kellogg and his son, Howard, Jr. The suggestion is that, as the trustee withdrew from the active control of the business, he was attempting to pass on such control to his son and that he considered retention of the stock necessary to the achievement of this end. While the father was undoubtedly pleased to see his son come along in the business, we do not believe that he considered it necessary to retain control of a large block of stock in order to further his son's position.

We think that the inference drawn by objectors as to Howard Kellogg's motive in retaining the Spencer Kellogg & Sons, Inc., stock in the trust is inconsistent with the entire pattern of his conduct during the accounting period. During this period the trustee, by gifts, for the most part to members of his family or to trusts for their benefit, but also to various charitable organizations, cut his own holdings nearly in half. Some of these gifts were to Howard Kellogg, Jr., and to him as trustee for his children. He showed no desire, however, to concentrate ownership in Howard, Jr. Rather, his gifts to his children and grandchildren were on a substantially equal basis. Except for Howard, Jr., his children were not active in the business, and all of the children were free to dispose of the stock given to them in such manner as they wished.

We have already mentioned the trusts created by Spencer Kellogg in favor of his daughters, Mrs. Neale and Mrs. Terry. Howard Kellogg was a cotrustee of each trust, the other trustees being the Marine Trust Company of Western New York and the respective beneficiary. During the accounting period these trusts sold more than 50,000 shares of the stock of Spencer Kellogg & Sons, Inc., totally eliminating it from the Neale Trust and reducing it to 500 shares in the Terry Trust. Although he advised his sisters against such sales, especially at the prices then prevailing, he acquiesced in the sales once his advice was

rejected by them. It is interesting to note that the average price received by the Terry Trust on these sales was less than $19½ per share, and in those sales which took place after Mrs. Terry had first, in 1953, suggested selling the Spencer Kellogg & Sons, Inc., stock in the Lochevan Trust and replacing it with municipal bonds, the Terry Trust received an average price of less than $16 per share.

It is also significant that Howard Kellogg resigned as chairman of the board of the company in 1953, and that from then on he withdrew from active participation in and control of the affairs of the business.

From 1955 until the Textron merger the Kellogg management, with Howard Kellogg's apparent approval, was seeking a merger into a larger business.

In summary, Howard Kellogg gave a good amount of his own stock away. In so doing, he showed no inclination to concentrate ownership in Howard, Jr. He acquiesced in the wishes of his sisters to dispose of the stock held by their trusts. He gave up his position as head of the company and ceased to take an active interest in it and he co-operated in effecting a merger of the company.

It might be argued that the trustee was free to so dispose of his own holdings only because he felt safe in his control of the corporation by reason of the stock held by the trust. Such an argument, however, implies a very deliberate, self-conscious and cunning pursuit of his own intrests to the deliberate detriment of those of the trust, of which he and his own brothers and sisters were the primary beneficiaries.

Howard Kellogg's relationships with some of the beneficiaries might have been more tactful; he might have shown more patience and consideration for their feelings and sought a more harmonious relationship with them. His failure, in this respect, however, is not indicative of any cold, calculated plan, such as one to dispose of part of his own stock and maintain control of the company through the trust stock.

In consideration of all the testimony in this case and our observation of Howard Kellogg, we do not believe that in retaining the stock of Spencer Kellogg & Sons, Inc., he acted out of selfish interests. We note in passing that he was not reimbursed for his expenses as trustee and that he spent some $80,000 of his own money in improvements to the Lochevan real property, including a walk-way to a dock, which we infer was for the common benefit of all those living on the property.

More important than the mere absence of selfish motives, however, were Howard Kellogg's affirmative reasons for retain-

ing the stock in the trust. Here we have arrived at the central and most difficult question of the controversy. Considering all the circumstances, was retention of the stock of Spencer Kellogg & Sons, Inc., consistent with the duty of prudence? As incidental to this question, we shall consider the assertion that Howard Kellogg as an officer of the company possessed "inside" information which it is charged should have given him reason to know that the earnings, yield and market value of the stock would decline from their high points of 1947 and 1948.

At no time have the objectors stated in detail of what such "inside information" consisted, nor have they demonstrated how from it, the conclusion necessarily followed that earnings, yield and market value were inevitably to decline. Certainly the mere knowledge that earnings would not be maintained at their high points of 1947 and 1948, was not sufficient to lead to the conclusion that the value of the stock as an investment was to decline. These earnings wer extraordinary, were recognized as such at the time, and did not result in a corresponding increase in the market value of the stock. They represented, in large part, inventory profits resulting from the lifting of price ceilings on the raw materials processed by the company.

Spencer Kellogg & Sons, Inc., was engaged in the processing and manufacture of vegetable oils, meals and feeds. It was the smaller of the two main factors in the vegetable oil industry. During the accounting period these industries were subject to great cyclical fluctuation, which was reflected in the fluctuation of both the earnings of the company and the market value of its stock.

Generally, the vegetable oil industry was in a depressed state during the accounting period, which witnessed significant shifts in consumption and demand of its own and competing products. A major cause of the over-all decline of the industry during this period lay in the policies of the Federal Government, which provided price supports for the raw materials of the industry. For example, towards the end of the accounting period when business seemed to be improving, the government raised the support price of soybeans, to the detriment of soybean processors. Since the cost of the final products of the industry consisted very largely of raw material costs, the effect of these price supports was to put the industry at a severe competitive disadvantage, causing a shift to competing products.

All of these factors were, of course, known to Howard Kellogg as they occurred. Obviously, however, he could not foresee

every phase of the business cycle, every development in the competitive situation, and, especially, every action of the Federal Government. Throughout the period, the trustee had confidence that the long-range prospects of the business were good. That was his judgment. He may have been wrong, but it was not a matter of certainties nor simply of information.

The only real inside information possessed by Howard Kellogg during the accounting period was the knowledge that, from 1955 on, management was actively seeking to merge into a more diversified corporation at a price substantially higher than that currently afforded by the market. The conclusion to be drawn from this inside information was, of course, diametrically opposed to that asserted by the objectors. With the prospect, eventually realized in the Textron merger, of obtaining a higher price for the trust stocks than that afforded by the market, the trustee could hardly have sold the stock on the market without justifiable criticism on the part of the beneficiaries of the trust.

We might note that the mere failure to diversify, does not in itself constitute negligence. (*Matter of Pate* 84 N. Y. S. 2d 853, *supra.*) As stated by the court in *Matter of Adriance* (145 Misc. 345, 352): "It is entirely true that many financial authorities advocate wide diversity of investment. It is equally true that others as strenuously affirm the contrary, and agree with the familiar admonition of the late Andrew Carnegie: 'Put all your eggs in one basket and watch the basket.'"

As one reason for retaining the stock in the trust, the trustee testified that his father had told him that the stock was being placed in the trust in order to pay for the upkeep of the Lochevan property and that it was his desire that the stock be retained. At that time we took such testimony subject to a motion to strike. We now deny that motion. Under the circumstances, we think parol testimony of this nature is admissible. (*Matter of Ryan,* 186 Misc. 688 [1945]; *Matter of Weston,* 91 N. Y. 502 [1883].) We do not consider this testimony of much importance, however, especially in view of the great period of time since the instrument was executed and the intervening changes in circumstances.

Of real importance are the business factors which entered into the trustee's determination not to sell the stock on the market. They may be summarized as: (1) confidence in the company and a corresponding belief that the stock was undervalued on the market; (2) the high yield of the stock based on its market price; (3) the capital gains tax which would accrue

on any such sale, and (4) the expectation of achieving a higher price upon consummation of a merger with any of several prospective purchasers.

As might be expected, the stock fluctuated greatly during the accounting period, between a high of 29-5/8 and a low of 11-7/8. Throughout this period, however, the book value remained at about $36 per share and working capital at about $15 per share. Howard Kellogg felt that this book value would eventually be reflected either in a higher market value or in a higher price per share upon a merger.

He also considered important the fact that there were no bonds or preferred stock in the company.

Spencer Kellogg & Sons, Inc., had never failed to pay a dividend. During the accounting period yearly dividends never went below $.80 per share, the rate for the last five years of the period. Thus the yield, based upon market value of the stock, was high, and the trustee considered income an important factor in this trust.

The cost basis of the stock in the trust was $6.14 per share. Thus a capital gains tax would have been incurred upon any outright sale of the stock, thus reducing both the corpus and the income of the trust.

From at least 1955 until the final merger into Textron, Inc., the management of the company was engaged in negotiations with various parties concerning the possibility of the merger of the corporation into another. The objectives of management were to effect greater diversification and stability in earnings, if this could be achieved at a desirable price, and, if possible, without giving rise to a capital gain on the part of the stockholders. The price originally sought was $30 per share, but was later reduced to $25 per share. In 1961, after the merger with Textron had been set at an exchange of seven shares of Spencer Kellogg & Sons, Inc., for six shares of Textron, Inc., but before the actual merger, the former reached a high of $22.50 per share. The merger permitted a tax free exchange of stock so that the trust could continue to receive income based upon the full value of the corpus undiminished by reason of a capital gains tax.

There were, as we have set forth, many factors before us for consideration in determining whether or not the actions of Howard Kellogg, as trustee, meet the test of prudence. We especially consider the prospects of attaining a higher price for the stock than that prevailing in the market and obtaining it on a merger basis, thus avoiding the imposition of a capital gains tax with resulting loss of principal and income. Further

we especially consider the rarity with which infallibility is found in matters of business judgment. We find that, weighing everything, Howard Kellogg's conduct was consistent with the duty of prudence imposed upon him by law. (Cf. *Matter of Clark,* 257 N. Y. 132 [1931]; *Matter of Easton,* 178 Misc. 611 [1942], affd. 266 App. Div. 713 [4th Dept. 1943]; *Matter of Pate,* 84 N. Y. S. 2d 853, *supra; Matter of Dow,* 32 Misc 2d 415, *supra;* Moore, A Rationalization of Trust Surcharge Cases, 96 U. of Penn. L. Rev. 647 [1947–1948].)

Although we do not reach the question of the measure of damages, it might be well to indicate briefly the nature of the problem. Objectors seek to measure damages upon the basis of the performance in the market of any of several groups of securities, e.g., the Dow-Jones Average and certain well-known common stock and balanced funds. Traditionally, however, damages for unauthorized retention of securities are measured as of the time the securities should have been disposed of; that is, damages consist of the value of the securities at that time, together with interest, less the value at the time of the accounting and less any dividends or other income received from the unauthorized securities. If the question were reached, this, we think, would be the measure of damages properly to be applied in the present case; it would result in no damages or an amount far less than that sought by objectors. (2 Scott, Trusts (2d ed., 1956), § 212-A, see, also, §§ 205, 207, 207.1, 207.2, 209, 211; Restatement, Trusts 2d [1959], §§ 205, 206, 208, 209; *Matter of Garvin,* 256 N. Y. 518 [1931]; *Matter of Davenport,* 104 N. Y. S. 2d 433; *Matter of Talbot,* 141 Cal. App. 2d 349 [1956].)

Were we to reach the question of damages, we would be required also to consider to what extent, if any, acquiescence on the part of the respondents, or some of them, in the retention by the trustee of the Spencer Kellogg & Sons, Inc., stock might limit their rights, a problem which we shall no more than mention here. (See *Matter of Garvin, supra.*)

We hold that the objections have not been sustained and that Howard Kellogg did not violate his fiduciary duties as trustee of the Lochevan Trust. We do not, however, pass on the propriety of the continued retention of the Textron, Inc., stock.