Millard L. Midonick, S.
In this accounting proceeding for the period from November 1, 1967 to October 31, 1971, objections have been interposed on the purchase, sale and retention of various stocks and bonds which comprised a portion of a common trust. The proponent trustee bank moves for summary judgment dismissing all objections. The motion is based on a contention that the procedure which this corporate trustee follows in the course of its investment decisions is in accord with the Banking Law of the State of New York, the regulations of the New York State Banking Board, and that as a result of careful analysis by various investment departments, their decisions regarding each of the investments objected to were prudent as a matter of law.
The objectants, who are guardians ad litem, one for principal and one for income beneficiaries, have cross motions for summary judgment arguing that there are elements of the *1090 corporate decision-making process as exercised by the proponent which are imprudent and, more specifically, that the investments which were the subject of the objections were improper notwithstanding the elaborate corporate structure designed to insure the prudency of investment decisions.
At the conference with the court, all parties stated in open court as follows: "[A]ll parties are of the opinion that the record is complete as to their respective positions and arguments on this motion for summary judgment and that no hearing is required on the motion for summary judgment. * * * In the event of trustee’s motion for summary judgment dismissing the guardian’s [sic] objections should be denied in any respect, the trustee reserves its right to proceed to trial of the issues remaining.” As discussed below, no triable issues of fact exist. Accordingly, no hearing is required on the motion and cross motions for summary judgment. Compare Matter of Bank of N. Y. (35 NY2d 512, 516), where the guardian affirmatively indicated his readiness to dispose of the objections on the record before the court on the trustee’s motion to dismiss. The same is the case here. It should be noted that the record here is much stronger for dismissal of objections than that in Matter of Bank of N. Y (supra), where examinations before trial showed some circumstances seemingly warranting a trial as set forth by this court in the New York Law Journal (Jan. 12, 1973, p 17, col 2), but the Court of Appeals determined that no trial was necessary.
In the course of corporate management of a discretionary common trust, it may be expected that objections will arise where substantial losses have been suffered on certain investments. However, the mere fact that there were some losses cannot be the basis for surcharging a trustee. Here, the gains outweighed the losses by 15 times.
More than 140 years ago Justice Putnam observed in a landmark decision (Harvard Coll, v Amory, 26 Mass 446) that the principal of a trust is always at risk no matter what the trustee does and, therefore, all that can be expected of him is that he shall conduct himself faithfully and exercise a sound discretion and heed how other men of prudence, discretion and intelligence manage their own affairs not in regard to speculation but in regard to the permanent disposition of their funds. Very much the same rule was formulated in our Court of Appeals in King v Talbot (40 NY 76, 85-86) wherein the following language was used: "the trustee is bound to employ
*1091 such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.” Thus the classical test is one of conduct. (Matter of Clark, 257 NY 132; Costello v Costello, 209 NY 252.) It finds expression in the oft-repeated rule that prudence is tested at the time of the investment decision, not from the vantage point of hindsight. (Matter of Hubbell, 302 NY 246.) In Matter of Bank of N Y (35 NY2d 512, 517, supra), the Court of Appeals said: "Initially we do not agree with what appears to have been in part the basis on which the majority at the Appellate Division reached its conclusion. The fact that this portfolio showed substantial overall increase in total value during the accounting period does not insulate the trustee from responsibility for imprudence with respect to individual investments for which it would otherwise be surcharged (cf. King v. Talbot, 40 N. Y. 76, 90-91; 3 Scott, Trusts [3d ed.], § 213.1, pp. 1712-1713). To hold to the contrary would in effect be to assure fiduciary immunity in an advancing market such as marked the history of the accounting period here involved. The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole. The focus of inquiry, however, is nonetheless on the individual security as such and factors relating to the entire portfolio are to be weighed only along with others in reviewing the prudence of the particular investment decisions.”*
In view of this latest pronouncement there can be no doubt that the test to be applied is one of conduct rather than performance as reflected more expressly in the legislative declaration of EPTL 11-2.2 (subd [a], par [1]). The over-all performance of the common trust fund in this case is a factor to be weighed along with others in reviewing the prudence of individual investments. That the trust portfolio showed a substantial over-all increase in total value during the account *1092 ing period does not insulate the trustee from responsibility for imprudence with respect to individual investments for which it would be otherwise surcharged. (Matter of Bank of N Y, supra.) However, any attempt to define the measure of surcharge solely by comparison with national stock indices such as Dow Jones Industrials or Standard & Poor’s must necessarily fall short of the mark for such comparisons relate primarily to factors of performance rather than prudence as to conduct involving foresight. It is true, of course, that in some instances an inference in respect of imprudence may be drawn, at least in part, on basis of performance. Nonetheless, as I concluded in a recently published article: "It seems clear that the law of New York now provides that the test is one of conduct rather than one of performance.” (State’s Changing Prudent Person Rules, NYU, Nov. 15, 1976, p 2, col 3.)
The guardian for principal has objected to the acquisition of John Deere Series "A” and "B” debentures, the Northern States Power Company bonds and United States Gas Corporation debentures upon the ground that they were purchased in violation of statute and in breach of trust. Section 100-c of the Banking Law and the Banking Board regulations (3 NYCRR 22.10) require specific approval by the common trust fund committee of each security purchased or sold. 3 NYCRR 22.10 requires that a trust investment committee "shall keep full and complete minutes of all decisions and activities relating [to a common trust fund] including * * * (c) the approval of every purchase and sale of an investment for the common trust fund”. The facts satisfactorily establish a compliance with the statute and with the regulations in that regard. Moreover, the four securities in question were purchased in a prior accounting period and approved in a prior decree. It is well-settled law in this State that a decree settling the account of a trustee binds all persons over whom the court obtained jurisdiction and that all such persons are thereafter barred from seeking to surcharge the trustee for any act or omission which occurred during the accounting period and was revealed in the accounting. (Matter of Roche, 259 NY 458; Matter of Bank of N. Y, 35 NY2d 512, 517-518; Matter of Baker, 249 App Div 265; Matter of Froehlich, 82 NYS2d 884, affd 275 App Div 707; Ungrich v Ungrich, 141 App Div 485; Matter of Kellogg, 35 Misc 2d 541; Matter of Marine Midland Bank — New York, 77 Misc 2d 543; Banking Law, § 100-c, subd 14.)
*1093 The guardian for principal also objects to the securities specified above on the basis of yield and retention. The objection finds no support on the record before the court that the trustee retained the securities in bad faith or that the trustee was imprudent in failing to foresee rising interest rates which resulted in the decrease of market values of these securities during the accounting period. Indeed the guardian for income has observed in his report to the court that he "computed the yields to maturity [of these securities] in relation to current market values as of the dates referred to in the periods introduced in Mr. Kridel’s [guardian for principal] report * * * and had not found evidence that such yields were below comparable current rates as set forth in such periods.” The objections relating to these securities are accordingly dismissed.
Turning next to the objections of the guardian for principal in respect of the retention of the listed convertible bonds of American Airlines, Sandors Association and Dillingham Corporation, we find that the facts show diligent investigation of these securities by the trustee. The guardian for principal contends, however, that the yields of these securities were below the average corporate bond yields as shown by Standard & Poor’s charts. It appears that these charts refer to yields for nonconvertible corporate bonds. The trustee correctly points out that because of the conversion features of these securities the comparison is inappropriate. The trustee asserts that the convertible securities are purchased in lieu of related common stock when they have a higher current yield than their related common stock but similar potential for appreciation as the common stock. Obviously, the yield of convertible bonds is also more secure than that of related common stock because it does not depend as closely upon earnings or directors’ approval. Accordingly, the objections on the basis of the yield from these securities are dismissed. The affidavit of John K. Pfeiffer, vice-president of Standard & Poor’s Corporation, describes the meaning and significance of the Standard & Poor’s corporate bond ratings as follows: "Standard & Poor’s corporate bond ratings measure the relative quality of bonds based upon the degree of security as to payments of principal and interest. In the case of convertible bonds, the ratings are made wholly without regard to the convertible feature of the bond, that is, the ratings are based solely upon a determination as to the degree of security of payments of principal and income. *1094 The convertible bond rating does not consider the many factors which determine the market prospects of the related common stock, which prospects are in turn determinative of the market prospects of the convertible bond itself. Lower rated convertible bonds may be extremely attractive for investment because of their price and the favorable prospects for market appreciation of their related common stock.”
With respect to the issues objected to, the bond ratings during the periods subject to objection were "BB” and "B” and Standard & Poor’s has often recommended the purchase of "BB” rated and "B” rated convertible debentures, as is stated by Mr. Pfeiffer. It should be noted that in Matter of Bank of N Y. (supra), the fact that the Boeing stock was rated as "speculative” by Moody’s, and by Bank of New York’s research staff, was not deemed by the Court of Appeals to require a trial on the issue of the prudence of investment in such stock. It is apparent, therefore, that the ratings alone do not constitute a valid criterion in the circumstances upon which to judge the prudence of an investment in a convertible debenture and these objections are dismissed.
The guardian for principal objects to transactions involving Eastern Airlines common, Sunstrand common, Raytheon convertible preferred, and Penn Central common stock. The court is of the opinion that such objections do not form a basis upon which a surcharge may be granted. It appears from the facts and circumstances presented that investment decisions in the fund are the product of the trustee’s common trust fund committee which was composed of senior officers of Morgan Guaranty. Its decisions with respect to purchase, sale and retention of securities in the fund were augmented by the minutes, recommendations and pertinent reports supplied by the trustee’s investment research department, its economist’s department, and its common stock committee. The trustee describes the investment department as one which included about 30 investment officers headed by an executive vice-president of the trust and investment division and four senior vice-presidents. All the officers (except those responsible solely for operations) and members of the common trust fund committee attended a daily meeting on business days held at 8:45 a.m. for the purpose of keeping informed of daily events pertinent to investment determinations. Additionally, certain officers were assigned industries and companies to follow and report upon. The investment department officer assigned to *1095 the fund was responsible for reviewing the holdings of the fund and for proposing changes which he considered appropriate. The investment research department is described as including more than 30 officers and analysts headed by a vice-president who is assisted by 2 other vice-presidents, 12 officers and 15 senior and junior analysts. This department reviewed and analyzed in detail major industries and individual companies, had access to reports and other data made public by the subject companies as well as the trade publications and statistical services. Its members maintained contacts with other analysts in brokerage houses and also made field trips to the companies to assess management and company operations. The elaborate description of the formal proceedings disclosed in the record before the court as well as the extensive investigations and considerations of the afore-mentioned securities by the appropriate committees, as revealed on this record, support no other conclusion than that the investment transactions were not imprudent.
With respect to the purchase and retention of Penn Central common stock, the record shows that extensive reports were prepared on at least six occasions in 1969 alone, and often before that year, by the investment research department and the security was sold upon recommendation of an analysis of the declining revenue of the railroad industry in October, 1969. Moreover, during this period other investors, including trusts, were actively trading in this security. The fund sold the stock in October, 1969 at $35 per share. Seven months later the stock declined to $6 per share. This security enjoyed a market inventory on November 1, 1967 when this accounting period began of 5,900 shares at approximately $57 per share and advanced during the period before sale to 86 Vz and declined to $55 in May, 1969. Accordingly, the objections to the retention of these securities are dismissed.
The guardian for income has filed objections in his report to the court and has requested that Morgan Guaranty be required to reimburse 73 participating trusts which withdrew from the fund as of October 31, 1971 .an aggregate amount of $161.26 representing income that these trusts should have received upon withdrawal in respect of two stock dividends which should have accrued in the fund as of October 31, 1971. The trustee concedes that through administrative error, the dividends were accrued in the succeeding quarter and the income which should have been so distributed was distributed *1096 to other participants in the fund in the succeeding quarters. Analysis discloses that two of the withdrawn trusts are entitled to $15. Fifty-five of the said trusts were each entitled to amounts less than 65 cents and of these 55 trusts, 23 were each entitled to 6 cents. In view of the fact that there is no question that the common trust fund benefited since the said sum was accrued in the fund in the succeeding quarter, the fact that the loss to the withdrawn trusts is de minimis and the apparent fact that the estimated expenses entailed in reimbursing the withdrawn trusts the sums to which they are entitled would far exceed the sums in issue, the court holds that the Morgan Guaranty is not required to make such reimbursements.
The guardian for principal and the guardian for income have objected to the payment of the legal fee incidental to this accounting on the ground that it was paid prior to the accounting decree. The amount of the fee, however, is not objected to. The court has carefully reviewed the affidavit of services of the attorney and is satisfied as to the reasonableness of the fee received and the same is hereby ratified. The objections in that regard are dismissed.
Objections with respect to payment to the firm of Ernst & Ernst for services to the accounting bank are also dismissed. The court has examined the affidavit of services and is satisfied that the services were proper, reasonable and required; the fee is accordingly approved and ratified.
In view of all the foregoing, the motion for summary judgment is granted and the cross motion for summary judgment is denied.

 Beginning inventory herein of Morgan Guaranty Trust Company fund, $58,000,-000; unrealized gains at closing market approximately $11,000,000; net realized gains approximately $7,000,000.