Luiz Eduardo Fontes WILLIAMS, Plaintiff,

v.

J.P. MORGAN & CO. INCORPORATED, Defendant.

Morgan Guaranty Trust Company of New York Third–Party Plaintiff,

v.

Maria Thereza Fontes Williams, Third–Party Defendant.

No. 00 Civ.6321 VM.

United States District Court, S.D. New York.

March 11, 2003.

R. Scott Greathead, Howe & Addington, L.L.P., New York City, for Plaintiff.

Bradley I. Ruskin, Peter J. W. Sherwin, Jeremy J. Best, Proskauer, Rose, L.L.P., New York City, for Defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Luiz Eduardo Fontes Williams ("Williams") is a remainderman of an inter vivos trust (the "Gem Trust"). Invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332, Williams filed suit against the trustee of the Gem Trust, defendant J.P. Morgan & Co. Incorporated ("Morgan"), seeking damages for breach of fiduciary duty and an accounting. Morgan then impleaded third-party defendant Maria Thereza Fontes Williams ("Maria Williams"), asserting the right to contractual indemnification, indemnification by estoppel and unjust enrichment if Morgan is found liable to Williams. Maria Williams now moves for summary judgment on the third-party complaint filed by Morgan. For the reasons set forth below, the Court GRANTS Maria Williams's motion in its entirety.

### I. BACKGROUND

The principal facts underlying Williams's claims against Morgan are set forth in the Court's Decision and Order, dated May 7, 2002. *Williams v. Morgan*, 199 F.Supp.2d 189 (S.D.N.Y.2002) (*"Williams I"*). Here, the Court will outline the facts relevant to the third-party complaint that is the subject of the instant motion for summary judgment.[1]

Williams is a remainderman of the Gem Trust, which was created in 1958 by his father, John Williams, who was also Maria Williams's husband, with a corpus of approximately $500,000. Morgan, a New York corporation, was appointed the trustee. Maria Williams, a citizen and resident of Brazil, is the income beneficiary of the Gem Trust. Upon her death, Gem Trust's

---

1. The factual summary that follows derives primarily from the Memorandum of Law in support of Third–Party Defendant's Motion for Summary Judgment or, Alternatively, Partial Summary Judgment ("Maria Williams Mem."), dated September 16, 2002; Memorandum of Law in Opposition to the Motion of Maria Williams for Summary Judgment ("Morgan Mem."), dated October 24, 2002; Maria Williams's Statement of Material Facts in Support of Third–Party Defendant's Motion for Summary Judgment, dated September 16, 2002; Morgan's Counter–Statement of Material Facts in Opposition to the Motion of Maria Williams for Summary Judgment, dated October 24, 2002; and accompanying exhibits and affidavits attached thereto. Except where specifically referenced, no further citation to these sources will be made.

assets are to be distributed to her surviving descendants.

In the late 1960's, Davis Polk & Wardell ("Davis Polk"), as well John and Maria Williams, became aware of a bilateral tax treaty that was in the process of negotiation between the United States and Brazil, but would not take effect until ratified by the legislatures of both countries (the "Proposed Treaty").[2] According to the Proposed Treaty, the Brazilian tax authorities would be empowered to request information from the files of the Internal Revenue Service with respect to Brazilian citizens. As of January 1971, the United States Senate had ratified the Proposed Treaty, with certain reservations, but the Brazilian Congress had not yet accepted the Proposed Treaty. Historically, such treaties are made retroactive to January 1 of the year in which they become effective.

Upon consultation with Davis Polk, John and Maria Williams grew concerned that, because the Proposed Treaty set forth provisions allowing for an exchange of information between the tax authorities of the two governments, Maria Williams and her children could suffer severe consequences for having failed to report the money in the Gem Trust, and Maria Williams's income therefrom, to the Government of Brazil, including financial and criminal penalties, if the Brazilian authorities learned of the existence of the Gem Trust. Therefore, Maria and John Williams worked with Davis Polk and Morgan to develop a plan of action to avoid potential adverse consequences to the Williams family of the possible ratification of the Proposed Treaty. In the process of determining the best course of action, Davis Polk requested the law firm of Curtis, Mallet–

Prevost, Colt & Mosle ("Curtis Mallet") to provide two opinion letters regarding the possible penalties Maria Williams would suffer under Brazilian law if Brazilian authorities learned of the Gem Trust. (*See* Declaration of R. Scott Greathead ("Greathead Decl."), dated September 16, 2002, Exhs. B, C.) To avoid the possible penalties Maria Williams and her children could suffer under the effects of the Proposed Treaty, the plan of action developed was for the Gem Trust's assets to be reinvested solely in tax-exempt bonds so that the assets would no longer be reported for tax purposes in the United States.

Having decided on this course, Maria Williams authorized Morgan to liquidate the Gem Trust's tax-generating investments beginning in late 1970. This direction to Morgan was reduced to writing in a letter, dated January 18, 1971, from Maria Williams to William H. Hobson, a vice president at Morgan (the "Letter"). (*See* Greathead Decl. Exh. E.) Davis Polk drafted the Letter on Maria Williams's behalf, and the Letter was reviewed by Morgan before Maria Williams signed it. The Letter explains the nature of the Proposed Treaty, including the fact that, as of that time, the treaty was only in the negotiation stage. However, opining that such ratification was likely, the Letter tracks the conclusion stated in Curtis Mallet's opinion letters concerning Maria Williams's potential liability if the Proposed Treaty were ratified, and directs Morgan, as trustee, "to take whatever steps necessary in order to assure that [Maria Williams's] name and nationality will not appear on the trust's tax returns filed with [the U.S.] Internal Revenue Service after January 1, 1971." (*Id.* at 2–3.)

---

**2.** The parties dispute who became aware of the Proposed Treaty first, John Williams or Davis Polk. Likewise the parties dispute whether Davis Polk informed John Williams of the Proposed Treaty, or whether it was brought to Davis Polk's attention by John Williams. However, the analysis here is not affected by this factual dispute.

Maria Williams also indicates in the Letter that she understands that such disclosure could be avoided by selling the assets in the Gem Trust and reinvesting the proceeds of such sales into tax-exempt securities and therefore authorizes this action. Finally, and crucial to the instant motion, Maria Williams also relates to Morgan her own undertaking of responsibility with regard to the decision to sell the assets in the Gem Trust, a taxable event, and the subsequent reinvestment in tax-exempt bonds:

I hereby release and discharge you from any liability to me for making such sales and causing the trust to incur a net current decrease on account of capital gain taxes. In addition, *I hereby agree to indemnify you against any claims made by other beneficiaries of the trust arising out of my requested action.*

(emphasis added). (*Id.* at 4.)

Based on these instructions from Maria Williams, Morgan proceeded early in 1971 to liquidate the assets of the Gem Trust, reinvesting the proceeds in tax-exempt securities. In order to receive further reassurance concerning the propriety of its actions with regard to the Gem Trust, while still in the process of reinvesting the Gem Trust assets, Morgan requested that Davis Polk provide an opinion letter endorsing the strategy authorized by Maria Williams, which Davis Polk did on February 10, 1971 ("Opinion Letter"). (*See* Greathead Decl. Exh. F.) In its Opinion Letter, Davis Polk repeats the background circumstances leading up to the liquidation and reinvestment of the Gem Trust in tax-exempt securities, and the process by which Davis Polk came to the conclusion that this was the best course of action. The Opinion Letter explains that Maria Williams's concern that the Brazilian Congress would soon ratify the Proposed Treaty did not provide Morgan sufficient reason to conclude that ratification was imminent or probable, but concludes that:

[I]t is our opinion that [Morgan] may properly sell all of the securities in the trust which generate taxable income and reinvest the proceeds in securities generating tax-exempt income and that [Morgan] may maintain the trust portfolio invested entirely in securities which earn tax-exempt income until [Morgan] ha[s] reason to believe that the income beneficiary and the remaindermen will no longer be in danger and so long as the investment of the trust portfolio entirely in securities earning tax-exempt income will relieve [Morgan] of the duty of disclosing the name, address and nationality of the income beneficiary and remaindermen to the Internal Revenue Service.

*Id.* at 4–5.

The United States and Brazil never entered the Proposed Treaty. Williams thus claims that by the mid–1970's it was clear that the Proposed Treaty no longer posed a risk to the income beneficiary's interests and that Morgan breached its fiduciary duty as trustee at that point by not appropriately reinvesting the assets in the Gem Trust in light of the fact that the threat from the Proposed Treaty had disappeared.

Morgan seeks recovery in its third-party complaint from Maria Williams for any liability it may incur to Williams for its alleged failure as trustee of the Gem Trust to recognize that the Proposed Treaty was no longer relevant and, accordingly, to reconsider the propriety of the investments in the Gem Trust. Morgan bases its third-party complaint on theories of contractual indemnification, indemnification by estoppel and unjust enrichment.

Maria Williams counters that she is entitled to judgment as a matter of law on these three claims because (i) the indemnification commitment in the Letter is not enforceable; (ii) even if the indemnification

provision in the Letter were enforceable, it only covers the initial decision to liquidate and reinvest the Gem Trust assets, and not Morgan's subsequent obligation to continue to monitor the Gem Trust and to consider the appropriateness of keeping the assets in the Gem Trust invested in tax-exempt securities in light of developments concerning the Proposed Treaty; (iii) Morgan has no standing to assert the unjust enrichment claim; (iv) Morgan will, in any event, receive a credit for actual interest paid to Maria Williams with respect to any damages it may be determined to owe to Williams; and (v) Morgan's claim for unjust enrichment to recover from Maria Williams "excess" interest paid to her, as the income beneficiary, because the Gem Trust assets were invested in tax-exempt securities is too speculative to warrant consideration.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Rodriguez v. Hahn,* 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but, rather, "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. Am. Broad. Companies, Inc.,* 892 F.2d 1128, 1132 (2nd Cir.1989). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."

*Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.* at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2nd Cir.1998).

The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See U.S. v. One Tintoretto Painting Entitled "The Holy Family With St. Catherine and Honored Donor",* 691 F.2d 603, 606 (2nd Cir.1982) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

The Court is "mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.... The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2nd Cir.1985); *accord Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2nd Cir.1998).

Furthermore, where, as here, the nonmoving party will bear the burden of persuasion at trial, the moving party is entitled to summary judgment either where the evidence negates an essential element

of the non-movant's claims or where there is no evidence that would permit the non-movant to establish an essential element of his or her claim. *See Farid v. Smith*, 850 F.2d 917, 924 (2d Cir.1988).

## B. CONTRACTUAL INDEMNIFICATION

■ Maria Williams argues that the language of the Letter itself, and related documents and circumstances, demonstrate that the Letter could only support indemnification for damages arising out of Morgan's initial decision to reinvest the assets in the Gem Trust in tax-exempt securities and not Morgan's subsequent failure, as trustee and fiduciary, to monitor the status of the Proposed Treaty, and, upon finding that the Proposed Treaty had become irrelevant, to subsequently reinvest the assets of the Gem Trust accordingly. Since Williams is suing Morgan for its maintenance of the Gem Trust assets in the tax-exempt bonds after January 1, 1975, by which time Williams asserts Morgan, with the exercise of minimal diligence, should have known of the Proposed Treaty's irrelevance, Maria Williams argues that the indemnification contemplated in the Letter does not cover Williams's suit against Morgan.

Morgan argues in response that, since the language of the indemnification in the Letter does not preclude coverage, and in fact is very broad, Maria Williams of necessity resorts to extrinsic evidence to make her argument. Therefore, Morgan asserts that Maria Williams, by her own argument, concedes that this issue can not be resolved adverse to Morgan before trial because the law dictates that summary judgment on the scope of an agreement can be granted only when the agreement is unambiguous on its face without the use of extrinsic evidence. The Court disagrees with Morgan's application of the law to the facts in this case.

■ It is well settled that New York law "frowns upon contracts intended to exculpate a party from the consequences of his own negligence and though, with certain exceptions they are enforceable, such agreements are subject to close judicial scrutiny." *Niagara Frontier Transp. Auth. v. Tri–Delta Constr. Corp.*, 107 A.D.2d 450, 487 N.Y.S.2d 428, 430 (App. Div. 4th Dep't 1985) (citing *Van Dyke Prods. v. Eastman Kodak Co.*, 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693, 694 (N.Y.1963); 4 W. Jaeger, Williston on Contracts § 602A (3d ed.1968)). Addressing this point, the New York Court of Appeals explained that "[s]ince one who is actively negligent has no right to indemnification unless he can point to a contractual provision granting him that right, a rule has evolved under which courts have carefully scrutinized these agreements for an expression of an intent to indemnify and for some indication of the scope of that indemnification." *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799, 801 (1971); *accord Kurek v. Port Chester Hous. Auth.*, 18 N.Y.2d 450, 276 N.Y.S.2d 612, 223 N.E.2d 25, 27–28 (1966).

■ Accordingly, the rule is that " 'contracts will not be construed to indemnify a person against his own active negligence unless such intention is expressed in unequivocal terms.' " *Levine*, 321 N.Y.S.2d 81, 269 N.E.2d at 801 (citing *Thompson–Starrett Co. v. Otis Elevator Co.*, 271 N.Y. 36, 2 N.E.2d 35, 37 (1936)); *see also Kurek*, 276 N.Y.S.2d 612, 223 N.E.2d at 27 ("[I]ndemnification has been permitted under contractual provisions though the language of those provisions fell short of expressly stating that its coverage extended to the active negligence of the party to be indemnified where, as here, that appears to have been the unmistakable intent of the parties."); *Heimbach v. Metro. Transp. Auth.*, 75 N.Y.2d 387, 553

N.Y.S.2d 653, 553 N.E.2d 242, 246 (1990) (in an indemnity agreement "the contractual language would have to have evinced an 'unmistakable intention' ... before a court would enforce such an obligation"); *Haynes v. Kleinewefers,* 921 F.2d 453, 456 (2d Cir.1990) (when a claim is made that a duty to indemnify is imposed by contract exonerating a negligent party, an "unmistakable intent to indemnify the negligent party" must be found).

■ Moreover, because of the strict scrutiny given to indemnification clauses that purport to transfer liability for one party's active negligence to another, the language of the contract is analyzed in light of "the surrounding facts and circumstances" to determine the intent of the parties. *Hooper Assoc. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 905 (1989) ("The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.") (citations omitted); *Margolin v. New York Life Ins. Co.,* 32 N.Y.2d 149, 344 N.Y.S.2d 336, 297 N.E.2d 80, 82 (1973) (upholding indemnification of a party's liability for its own negligence only if "the intention to indemnify can be clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances."); *Spetalieri v. Kavanaugh,* 36 F.Supp.2d 92, 120 (N.D.N.Y. 1998) (entitlement to contractual indemnification exists only if the terms of the contract unmistakably provide for such indemnification). Therefore, in the case of an indemnification clause purporting to transfer liability for a party's own negligence, the surrounding facts and circumstances of an agreement should be considered at the outset.

■ For instance, in *Sequa Corp. v. Gelmin,* 851 F.Supp. 106, 110 (S.D.N.Y. 1994), the issue was whether an indemnity agreement that provided for coverage of claims "of any kind and nature" covered claims asserted by the indemnitor or whether the parties only intended to cover claims asserted by third-parties. Despite the broad nature of the language in the agreement, looking to the purpose of the indemnification agreement as evidenced by the language of the agreement and the surrounding facts and circumstances, the court, citing *Hooper,* 549 N.Y.S.2d 365, 548 N.E.2d at 904–905, held that the agreement did not unmistakably provide for the indemnification of claims between the parties to the agreement. *See also Haynes,* 921 F.2d at 457 (contract at issue providing for the assumption of obligations and liabilities "arising in the ordinary course of business" did not support "a clear implication of an unmistakable intent to indemnify."); *Bourne v. MPL Communications, Inc.,* 751 F.Supp. 55, 56–57 (S.D.N.Y.1990) (because "the parties' intentions to provide indemnification for claims between the parties were not 'unmistakably clear' from the language of the promise" the court did not construe the indemnification to cover the claim asserted); *Spetalieri,* 36 F.Supp.2d at 120 (insufficient evidence before the court of an unmistakable understanding between the parties that defendants had agreed to indemnify plaintiff and thus no such agreement could be found). Accordingly, indemnification agreements or provisions must be read and understood in context and construed to exonerate a party from its own negligence only if the intent is unmistakable and unequivocal.

The Court notes that this doctrine has been scrutinized and refined by the New York court of Appeals. Indicating that it has "no conceptual difficulty with such a rationale," in *Levine* that court clarified this rule of contract interpretation because of its sense that the doctrine had been overextended. 321 N.Y.S.2d 81, 269

N.E.2d at 802. The *Levine* court explained that while the rule of law stands, there need not be specific reference to active negligence in the agreement for the indemnity provision to be enforceable. Rather, when it is clear that a "contract provides that indemnification will be for any and all liability," courts should not find such clauses invalid. *Id.; See also Niagara,* 487 N.Y.S.2d at 430.

The *Niagara* court indicated that where "the indemnification agreement has been negotiated at arm's length between sophisticated business entities, the intent being to allocate the risk of liability to third parties between themselves, essentially through the employment of insurance, the rule has been somewhat liberalized." 487 N.Y.S.2d at 430 (internal citations omitted). However, even under this limited refinement of the rule, which does not apply in this case, the *Niagara* court reaffirmed that it is still necessary that the intention to indemnify can be " 'clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances.' " *Id.* (quoting *Margolin,* 344 N.Y.S.2d 336, 297 N.E.2d at 82).

The rule of contract interpretation outlined at length above is particularly germane to the facts presented in this case. First, the Letter is expansively construed by Morgan to exonerate it even from its potential liability for negligent management of the Gem Trust, for which it acted as sole trustee.

Second, the surrounding circumstances and facts shed light on the intent of the broad language in the Letter. While the "arising out of" language in the Letter signed by Maria Williams leaves open the possibility that the indemnification provision pertains to any claim asserted by the Gem Trust beneficiaries that could not have been asserted "but for" the initial reinvestment in tax-exempt securities of the Gem Trust assets, the surrounding documentation and circumstances leave room to doubt that Maria Williams intended such a broad undertaking of responsibility.

The context of the Letter written by Maria Williams points to the Proposed Treaty as the only reason for her direction, and thus is sound evidence that her instructions to Morgan were dependent upon the Proposed Treaty's eventual enactment, or continued contemplation. It is unclear from the Letter itself and dubious in light of the surrounding circumstances that Maria Williams intended to take on the responsibility herself of monitoring the progress of the Proposed Treaty in the United States Senate and the Brazilian Congress. There is even less support in this context for a proposition that Maria Williams contemplated extending her indemnify obligation for all time and for all reasons even if the Proposed Treaty never took effect.

In particular, the Opinion Letter written by Davis Polk, which was requested by Morgan essentially as reassurance and confirmation for the reinvestment direction in the Letter written by Maria Williams, explicitly indicates that the propriety of the action requested by Maria Williams is based solely on the Proposed Treaty, which was then being contemplated by the United States and Brazilian governments. Furthermore, the nature of the Opinion Letter is such that it focuses the ultimate responsibility for monitoring the status of the Proposed Treaty on Morgan, the trustee. While Davis Polk advises that the Letter from Maria Williams is sufficient for Morgan to conclude that the income beneficiary and remaindermen of the trust will suffer financial loss and possibly jail sentences were the trust to become known to Brazil, Davis Polk specifically warns Morgan that the Letter does "not constitute a sufficient basis to form an opinion

[as to] whether or when the tax convention will be ratified by the Brazilian Congress." (*See* Greathead Decl. Exh. F at 4.) The Opinion Letter to Morgan goes on to advise that Davis Polk believes that the reinvestment decision is justified, given the current information available and to protect the income beneficiary and remaindermen,

> until *you* have reason to believe that the income beneficiary and the remaindermen *will no longer be in danger* and so long as the investment of the trust portfolio entirely in securities earning tax-exempt income will relieve *you* of the duty of disclosing the name, address and nationality of the income beneficiary and remaindermen to the Internal Revenue Service.

*Id.* at 4–5, 344 N.Y.S.2d 336, 297 N.E.2d 80. (emphasis added). Davis Polk was very careful to advise Morgan that the reinvestment decision was proper only in light of the danger to the income beneficiary and the remanindermen, and only "until" *Morgan* continued to have reason to believe the risk existed. In other words, the Opinion Letter clearly conveys that absent any such danger, for whatever reason, Morgan would be obliged to act otherwise.

Given that Davis Polk drafted both the Letter sent by Maria Williams and the Opinion Letter, and in light of the language of the Opinion Letter carefully advising Morgan of the limits of the propriety of the reinvestment of the Gem Trust assets, it is highly doubtful that Davis Polk felt that Maria Williams was thereafter undertaking all obligations with regard to the Proposed Treaty's affect on investment decisions for the Gem Trust. Since Davis Polk was so integrally involved in the reinvestment strategy, the Opinion Letter's cautioning tone to Morgan renders equivocal the scope of indemnification intended in the Letter by Maria Williams.

Furthermore, Maria Williams, at her deposition, asserts that she believed the Letter provided authorization to Morgan to liquidate and reinvest the assets in the Gem Trust. (*See* Deposition of Maria Williams ("Maria Williams Dep.") attached as Exh. 11 to the Affirmation of Peter Sherwin ("Sherwin Aff."), dated October 24, 2002, at 116.) However, since it appears that her focus was on authorizing Morgan to sell the tax-generating securities in the Gem Trust to avoid disclosure to Brazilian authorities under the Proposed Treaty, a fair reading of her testimony suggests that she did not seem to have focused substantially on the indemnification provision in the Letter or its significance: "Well, I don't think I gave it very much thought. It was nothing especially indemnified at the time." (*Id.* at 123.) When asked what she understood indemnification meant, she responded "replace." (*Id.* at 122.) While it is clear that she had some understanding of the concept of indemnification,[3] it is also clear that she did not contemplate the potential scope of the broad language in the Letter nor did

---

**3.** Further evidence that, although Maria Williams indicates that she read the Letter before she sent it to Morgan, she may not have had a full legal understanding of every provision in the Letter is the usage of the legal term "per stirpes" in the Letter, which, as could be expected, Maria Williams did not understand the meaning of at the time of her deposition and was clearly a term of art chosen by Davis Polk. (Greathead Decl. Exh. E at 1; Maria Williams Dep. at 113–114.) While the fact that the Letter was drafted by Davis Polk and that Maria Williams may not have understood the full legal impact of the Letter, does not, of itself, invalidate the Letter, it certainly affects the Court's analysis of whether the Letter reflects Maria Williams's "unmistakable" intent to indemnify Morgan for its responsibility to monitor the Proposed Treaty and the Gem Trust in the decades following the initial reinvestment decision.

she unmistakably intend to indemnify Morgan in perpetuity for all consequences of the initial reinvestment decision, including monitoring the account and the status of the Proposed Treaty.

Maria Williams is not a "sophisticated corporate entity," contemplated by *Niagara*, 487 N.Y.S.2d at 430, who was providing insurance to Morgan. She is not a lawyer, or a financial expert, which, undoubtedly, is part of the reason that Morgan was appointed trustee, and received fees for its fiduciary services. She left the trust arrangement to her husband, who had since passed away. (Maria Williams Dep. at 95.) She testified that she had no understanding of the investment strategies and consequences of the reinvestment action that she authorized. (*Id.* at 117–188, 487 N.Y.S.2d 428.) Therefore, the Court finds that, in light of the ambiguous language in the Letter, Maria Williams's unsophisticated posture further infuses doubt into the possibility that she unequivocally and unmistakably took upon herself such a complicated and fundamental obligation with regard to monitoring the progress of the Proposed Treaty's relevance and consequences to the investment of Gem Trust.

Based on all of these surrounding facts and circumstances, the Court finds that the "arising out of" language in the Letter does not import an unmistakable intent to indemnify Morgan for its responsibility to monitor the Proposed Treaty and to make corresponding investment decisions, despite its potentially broad application. *See Haynes*, 921 F.2d at 457 (contract language indicating assumption of liabilities of "other obligations and liabilities arising in the ordinary course" of business did not support unmistakable intent to indemnify); *Sequa*, 851 F.Supp. at 110 ("any and all" claims "of any kind and nature" did not expressly refer to indemnification of claims asserted between the parties to that agreement in light of surrounding facts and circumstances).

The cases cited by Morgan for its proposition that consideration of surrounding facts and circumstances, and all other extrinsic evidence, must be resolved at trial and not at the summary judgment are inapposite. (*See* Morgan Mem. at 16) (citing *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (N.Y.1973); *Brinson v. Kulback's & Assoc., Inc.*, 296 A.D.2d 850, 744 N.Y.S.2d 621, 622–23 (4th Dep't 2002)). These cases do not concern the narrow area of law regarding indemnification clauses which transfer liability away from an actively negligent party to an unsophisticated third-party.

In *Mt. Vernon Fire Ins. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 645 N.Y.S.2d 433, 668 N.E.2d 404, 405 (1996), the contract at issue was the exclusionary language of an insurance contract, not an indemnification provision transferring liability for active negligence. *See also Wesolowski*, 33 N.Y.2d at 170, 350 N.Y.S.2d 895, 305 N.E.2d 907 (at issue was the interpretation of the extent of coverage in an automobile insurance policy). Insurance contracts are intended to provide monetary security to parties by spreading risk, and are thus analyzed by the law in a different manner from discrete indemnification provisions. Thus, in *Niagara*, the court noted the liberalization of the strict scrutiny rule in the context of indemnification clauses that acted more like insurance contracts spreading risk between sophisticated parties than amorphous indemnification provisions. 487 N.Y.S.2d at 430. Furthermore, an insurance contract can be more objectively construed in light of its formulaic nature, in contrast to the Letter under consideration here which is a singular correspondence by an individual party.

In *Brinson*, which did deal with an indemnification provision, there was a triable issue of fact as to whether the third-party defendant was the actively negligent party.[4] 744 N.Y.S.2d at 622. The issue was which of two potentially negligent parties, engaged in a work order to jointly construct a Walgreen's drug store, was responsible for potential damages. *Id.* Therefore, it appears that the doctrine of strict scrutiny for indemnification provisions exculpating a party from the consequences of its own negligence outlined above was not applied by the court. Furthermore, in *Brinson*, the real issue was not whether indemnity was intended, but which parties had engaged in the indemnification agreement. Comparable to the fact scenario in *Niagara*, the indemnification agreement was "negotiated at arm's length between sophisticated business entities" allocating "the risk of liability to third parties between themselves" similar to insurance, justifying a weakening of the strict scrutiny doctrine, if it had been applied, which it was not. 107 A.D.2d 450, 487 N.Y.S.2d 428, 430. However, the case at hand is diametrically opposed to such a fact pattern; it is neither between two sophisticated business entities, nor does the Letter function like an insurance policy spreading risk.

Finally, the *Brinson* court held that the intent of the parties depends on "a choice between reasonable inferences to be drawn from extrinsic evidence." 744 N.Y.S.2d at 623. Here, the extrinsic evidence makes it clear that the intent of Maria Williams to indemnify Morgan for its alleged responsibility to monitor the propriety of the investments in the Gem Trust in light of the status of the Proposed Treaty is not unmistakable and unequivocal, and therefore

does not present a choice between reasonable inferences, given the strict standard governing the determination.

■ Furthermore, the contemplation of surrounding facts is proper at the summary judgment stage since it is a matter of law that an indemnification contract be strictly construed. *See Hooper*, 549 N.Y.S.2d 365, 548 N.E.2d at 904; *Haynes*, 921 F.2d at 456 (affirming summary judgment against non-moving indemnitee who "failed to meet the burden New York law imposes of establishing that it was 'unmistakable intent' to provide for indemnification for damages resulting from [the indemnitee's] negligence.")

Besides from pointing to the broad language of the Letter, Morgan asserts that Maria Williams's intent to indemnify Morgan for all claims that would not have arisen but for Maria Williams's authorization of the reinvestment of the Gem Trust assets, and not just the initial liquidation and reinvestment of the Gem Trust assets, is clearly supported by her reiteration of her request that Morgan leave the Gem Trust's assets in tax-exempt bonds, including in September 1991. This evidence is unconvincing.

First, Morgan can not thereby excuse all its fiduciary responsibility to monitor the assets in the Gem Trust, since Morgan does not claim that it first informed Maria Williams that the Proposed Treaty was no longer relevant, and she, with full knowledge, requested that the assets in any event remain in the Gem Trust.

Finally, the letter from John Williams to Morgan, dated September 21, 1991, (Sherwin Aff. Exh. 9), is from John Williams and not Maria Williams. But, more impor-

---

**4.** It is unclear from the facts recited in *Brinson* whether the third-party defendant was potentially an additional actively negligent party or the actively negligent party. In any

event, both parties were implicated in the negligence alleged, and therefore it was not a transfer of liability from a negligent to a nonnegligent party.

tantly, it gives no indication that Maria Williams knew of the irrelevance of the Proposed Treaty, and still wanted the Gem Trust assets to remain invested as they were. At the heart of Williams's lawsuit against Morgan is that Morgan was responsible for monitoring the Proposed Treaty; Maria Williams's continued belief that tax avoidance was a good course of action, without knowledge of the Proposed Treaty's subsequent alleged irrelevance, can not excuse Morgan of its responsibilities as alleged by Williams. Moreover, the Court sees nothing in the Letter or other evidence pointed to by Morgan that supports the proposition that Maria Williams, unmistakably, took responsibility to monitor the Proposed Treaty herself. (Morgan Mem. at 19.) In the final analysis, Morgan was the trustee of the account; Maria Williams was simply a beneficiary. For these roles to have been changed on an ongoing basis, more unequivocal language would have had to be used to convey this intention.

The surrounding facts and the context of the Letter, combined with the ambiguous language of the Letter, make it clear that the indemnification offered by Maria Williams was not unequivocal as it related to Morgan's continuing responsibility to monitor the status of the Proposed Treaty and the corresponding propriety of the investments in the Gem Trust. Therefore, since under such circumstances, the indemnification provision must be strictly construed, it must only be understood to indemnify Morgan for the original reinvestment decision and not for Morgan's alleged failure to monitor the propriety of the investments in the Gem Trust in subsequent years as is alleged by Williams. Morgan can not shirk its responsibilities to act as trustee and fiduciary to the Gem Trust, which is alleged to include monitoring the relevance of the Proposed Treaty to the Gem Trust investment portfolio, because in 1971 Maria Williams authorized a particular decision made in light of her belief that the Proposed Treaty would be ratified. Accordingly, Morgan's claim for contractual indemnification from Maria Williams must be dismissed.

## C. *IDENTIFICATION BY ESTOPPEL*

Morgan argues that equity necessitates the enforcement of the indemnification provision in the Letter, and therefore asserts a claim of indemnification by estoppel. Maria Williams asserts the opposite, that, in this case, equity precludes enforcement of the indemnification provision to cover the claims asserted by Williams against Morgan. Maria Williams contends that because, as a fiduciary to Maria Williams, Morgan had a duty of the utmost fair dealing, full disclosure and no hint of misrepresentations in its dealings with her, and that because the circumstances that brought about the Letter did not meet that standard of a fiduciary, the Letter can not be enforced against her to hold her responsible for Williams's claim against Morgan. In particular, Maria Williams asserts the lack of fairness because (1) Davis Polk improperly represented Morgan and Maria Williams in its preparation of the Letter; (2) Maria Williams should have been informed of her right to seek independent legal advice; (3) Davis Polk had an obligation to secure a written conflicts waiver from Maria Williams; and (4) Maria Williams was not informed of the meaning and effect of the agreement as it is alleged by Morgan.

Second, two of the letters pointed to by Morgan, (Greathead Aff. Exhs. H & J), were written by Morgan to Maria Williams, and in no way convey a request by Maria Williams to Morgan to keep the Gem Trust assets in tax-exempt securities. Rather, the first letter explains, without any regard to the alleged irrelevance of the Proposed Treaty, that upon the even-

tual passing of Maria Williams, there would be no way of avoiding disclosure of the Gem Trust's existence to the Internal Revenue Service, but in the second letter concludes that the Gem Trust would not be subject to United States estate taxes. (*Id.* Exh. H.) The second letter goes on to explain the procedure for moving the trust to Morgan (Bahamas) as trustee, an off-shore arrangement that would further avoid taxes and corresponding reports to the Internal Revenue service. (*Id.* Exh. J.) Considering possible ways of avoiding disclosure and concluding that trust assets should remain in tax-exempt securities, hardly presents a reiteration of Maria Williams's initial decision to keep the Gem Trust asset's in tax-exempt securities "greatly inhibit[ing] any chance for growth in the corpus of the trust." (Greathead Aff. Exh H). Most importantly, since Williams alleges the irrelevance of the Proposed Treaty should have been known by Morgan, such letters do not demonstrate that Maria Williams intended in 1971 that the Gem Trust assets remain forever in tax-exempt securities regardless of the status of the Proposed Treaty.

Morgan's claim for indemnification by estoppel is presumably based on the cases it cites for the proposition that beneficiaries are estopped from avoiding their indemnification obligation on equitable grounds where the indemnification agreement is valid and enforceable, although Morgan does not develop in detail this basis for indemnification which it asserts in its third-party complaint. (*See* Morgan Mem. at 6 (citing *In re Wohl's Estate*, 36 N.Y.S.2d 931, 936 (N.Y.Sur.Ct.1942); *In re Kern's Estate*, 159 Misc. 682, 288 N.Y.S. 655, 657–658 (N.Y.Sur.Ct.1936)). In any event, this claim for indemnification by estoppel is only valid to counter an equitable claim by Maria Williams to avoid a valid indemnification provision. However, where, as is the case here, the indemnification provision itself does not cover the claim for which Morgan seeks indemnification, an equitable estoppel claim is futile and must be dismissed. Similarly, it is also unnecessary to consider Maria Williams's equitable claims, since the Court holds that the Letter does not unequivocally cover the suit by Williams against Morgan.

## D. *UNJUST ENRICHMENT*

■ Morgan argues that Maria Williams received more interest than she would have if the Gem Trust had been invested diversely, including growth-oriented equities, as Morgan concedes would have been appropriate were the Proposed Treaty not a factor in the investment strategy for the Gem Trust. Therefore, Morgan contends that should it be held liable to Williams for damages for alleged negligence in keeping the Gem Trust asset's in tax-exempt bonds, Maria Williams should be liable to Morgan on the ground of unjust enrichment for any "excess interest" she earned.

However, Morgan's claim fails, as a matter of law, under the same reasoning which led this Court to conclude that damages in this case should be calculated under a lost capital analysis, as opposed to a lost profits analysis. *See Williams I,* 199 F.Supp.2d at 193. The Court explained that damages based on lost profits can be fairly characterized as "speculative" because in order to grant such damages "a court would be forced to generate and assign real-world value to the hypothetically reinvested proceeds from the asset." *Williams I,* 199 F.Supp.2d at 195 (citing *Matter of Estate of Janes,* 223 A.D.2d 20, 643 N.Y.S.2d 972, 974 (4th Dep't 1996)).

Similarly, to calculate Morgan's claim of unjust enrichment, the court would have to speculate as to how Morgan would have invested the Gem Trust assets had the Proposed Treaty been determined to be

irrelevant and what corresponding interest income would likely have been received by Maria Williams from such a portfolio of assets. Such an analysis is precisely the type of speculation rejected in *Janes. See* 643 N.Y.S.2d at 982. *Janes* explicitly rejects damages calculations based upon "the hypothetical performance of an investment of the proceeds of sale in the market." *Id.* (citing *Matter of Kellog,* 35 Misc.2d 541, 230 N.Y.S.2d 836 (N.Y.Sup.Ct.1962); *Matter of Morgan Guar. Trust Co. of N.Y.,* 89 Misc.2d 1088, 396 N.Y.S.2d 781 (N.Y.Sur. Ct.1977)). Determining the possible interest and dividend proceeds of a possible reinvestment by Morgan is not a calculation properly made under New York law. Just as the Court will not make such a speculative calculation for the benefit of Williams, it can not do so for the benefit of Morgan.

As both parties concede, the Court is instructed by *Janes* that "[d]ividends and other income attributable to the retained assets should offset interest awarded ..." 90 N.Y.2d 41, 659 N.Y.S.2d 165, 681 N.E.2d 332, 339 (1997) (citations omitted). Such deductions of actual income provided to Maria Williams are the entirety of the offset that Morgan is entitled to under the lost capital analysis in which the Court must ultimately engage.

### III.  *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that Maria Williams's motion for summary judgment to dismiss Morgan's third-party complaint is granted in its entirety.

**SO ORDERED.**